After running to some tennis courts to try to find someone with a phone, Fontenot spotted a patrol unit. He flagged down the police officer and told him a shooting was occurring. Police officers went to Mary's home and discovered that Mary and Briana were dead. Mary's body was found in the front doorway, and Briana's body was found in the back yard. A dark knit glove was found lying just outside the doorway to the bathroom, and a blue towel was found outside the home.
Fontenot later identified Appellant in a photo array.[4] DNA analysis showed that *254 Appellant could not be excluded as a contributor to DNA found on the glove and the blue towel.
II. VENUE
A. Trial Proceedings
1. Initial Hearing
Appellant filed a motion for change of venue due to media coverage of the case. The motion requested that the case be transferred to Galveston County. A hearing was held in May 2013 before Judge Layne Walker. The defense presented three witnesses who testified that there were numerous media stories describing Appellant as dangerous. The defense witnesses believed that Appellant would be more likely to receive a fair trial if the case were moved outside of Jefferson County. One of those witnesses also testified that the pretrial publicity in the community would prevent Appellant from getting a fair trial.[5]
The State presented four witnesses-a local television news reporter, the county tax assessor, the Chief Deputy District Clerk, and a prosecutor. The news reporter did not recall the case or any media coverage surrounding it. She testified that, in her opinion, if the television station had covered it a lot, she would remember it. The tax assessor testified that he had not heard of the case and that it had not been a topic in any of the conversations he had been privy to. The Chief Deputy District Clerk testified that she was a "news junky" but did not recall the case or any conversations about the case. She further stated that no one in the clerk's office "was even aware of who that was." The prosecutor had been involved in many capital cases and was familiar with Appellant's case. He testified that "for the type of case that it is, it's gotten less press than what I would normally see in a case of this magnitude."
2. Transfer Order
Judge Walker took the venue issue under advisement and said that he would announce his decision in a signed order. On July 29, 2013, he signed an order purporting to grant the motion to change venue without committing to where the case would be transferred:
The Court therefore hereby grants Defendant's Motion for Change of Venue. Venue in this case shall be transferred to a county outside of Jefferson County to be determined by the Court after consultation with counsel herein and review of available venues.
In October 2013, an email from the District Clerk of Galveston County to a staff person at a Jefferson County email address was forwarded to Judge Walker about Appellant's case. The email began with the statement, "Thank you for taking our call this morning. Please allow this email to confirm the issues we discussed and the questions we still have." The first item of confirmation was, "It is our understanding that the Judge will enter an order which confirms that this case is a change of venue to Galveston County according to Article 31.09 of the Code of Criminal Procedure."[6] The email also asked several questions about how the judge wanted voir dire proceedings to be handled.
*255 3. Reconsideration Hearing
Judge Walker resigned his bench and Judge Raquel West was sworn in as his replacement. The State filed a motion to reconsider the venue change, and in May of 2015, Judge West held a hearing on that motion. The State called April McKinnon, the archivist for the Beaumont Enterprise newspaper. McKinnon testified that Appellant's case had been mentioned in only three articles in the paper since May of 2013: (1) an article reporting that his case had been moved out of Jefferson County, (2) an article mentioning the case in connection with Judge Walker resigning, and (3) an opinion piece relating to the death penalty that, on the second page, mentioned Appellant as an accused facing the possibility of the death penalty. McKinnon further testified that the newspaper coverage appeared to be accurate and objective. On cross-examination, McKinnon admitted that, from 2010-2011, the newspaper had published twenty-five articles on Appellant's case.
The State also called Scott Lawrence, director and executive producer at a local television station. Lawrence testified that television coverage of Appellant's case was extensive during the first week to ten days after the crime, but "tapered off dramatically," and that in the years following the first couple of weeks after the event, "the coverage was extremely, extremely minimal." There were five times Appellant's case was mentioned on the television station in 2013 and no mention of Appellant's case after that time. He also testified that the television coverage was objective, emphasizing "just the facts," and was not inflammatory. Any reference to "armed and dangerous" was a statement attributed to the police and not offered as truth by the media outlet, and such statements were made when Appellant had not yet been arrested and was still at large. In Lawrence's opinion, the coverage of Appellant's case was "not unlike coverage that we've covered of countless murders that have occurred in Beaumont and countless crimes in the area," and, in his thirty-four years in the area, "this crime pales in comparison in terms of the coverage" to some of the prominent murder stories the station had covered. Lawrence stated that, taking into account the five year period from 2010 until the date of the hearing, Appellant's case "is not a story that is prominently recalled by the people in this area."
Judge West ruled that she could reconsider the issue of venue, but she reserved her ruling on the merits of the venue issue until after jury selection.
4. Jury Selection
The venire panel consisted of 120 prospective jurors. These jurors were selected through the I-Jury system, making the venire a general venire rather than a special venire. On the first day the venire was gathered, the trial judge agreed to inform the prospective jurors to avoid news for two days. During general voir dire, the prosecutor told the jurors to indicate in a written questionnaire whether they were familiar with or had heard anything about the case. The prosecutor also admonished the prospective jurors to base their verdict on the evidence presented in court and not on news stories that may have been heard outside of court. A written jury questionnaire included questions on whether the prospective jurors had seen or heard anything about the case and on whether they had formed any opinions as to the guilt or innocence of the defendant. None of the people selected as jurors or alternates had any knowledge about the case, nor did any of these people indicate that they were influenced by news coverage.
*256 After jury selection, Judge West revisited the venue issue. She granted the State's motion to reconsider and reopen the motion to change venue. She then offered to allow the parties to present further evidence and argument on the motion. The parties briefly presented argument. The defense argument was that Judge Walker had already changed venue and that Judge West should not have even held the hearing on the motion to reconsider in Jefferson County. After the parties' arguments, the judge remarked that none of the prospective jurors were dismissed based on information that they had learned about the case and stated, "I think that speaks volumes as far as the fact that we can have a fair trial and a fair jury here." The judge then denied the motion to change venue.
B. Analysis
1. Decision to Reconsider Venue Transfer
In point of error one, Appellant contends that the trial court lacked jurisdiction to reconsider the previous ruling granting the motion to change venue. He contends that venue was transferred to Galveston County, and once that occurred, the Jefferson County court lost jurisdiction to transfer the case back. The State contends that the Jefferson County court did not lose jurisdiction because the case had not been transferred to another court. According to the State, the failure to name a transferee court meant that the order granting a venue transfer was merely preliminary and subject to revision. Otherwise, the State contends, an order purporting to grant a transfer that fails to specify a transferee court would have the absurd result of putting the case in legal limbo, without any court having jurisdiction over the case. We agree with the State.
In Williams v. State , we recognized that the effect of a change of venue is to "remove the cause absolutely from the jurisdiction of the court awarding the change" and to "clothe[ ] the court to which removal is had with the same jurisdiction that reposed prior to the change in the court of original venue."[7] However, we held that a trial court could rescind an order changing venue where "no steps had been taken to carry out or to comply with the order changing venue" and the record reflects that the order was "improperly" entered.[8] The order in Williams had specified that venue would be changed from Bowie County to Red River County.[9]
The present case involves even less action with respect to changing venue than what occurred in Williams . The venue transfer order here did not even specify a transferee county; to the contrary, the order explicitly reserved the determination of a transferee county for a later time. Having failed to name a transferee county, the order could not, by itself, be effective in transferring venue. Appellant points to an email as confirming that the transferee county is Galveston. But the email was not from the judge, and it stated the expectation that the judge would enter an order confirming Galveston as the transferee county. No such confirming order was ever entered, so the case was never transferred to Galveston County. Point of error one is overruled.
*257 2. Decision to Retain Venue
In point of error two, Appellant contends that the trial court abused its discretion by retaining the case in Jefferson County. He contends that media coverage was so extensive and prejudicial that he could not have a fair trial in Jefferson County. Statute provides for a change of venue, on the basis of prejudicial publicity, if "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial."[10] A defendant seeking a change of venue must show that the publicity was "pervasive, prejudicial and inflammatory."[11] "Widespread publicity alone is not inherently prejudicial."[12] News stories that are accurate and objective are generally not considered to be prejudicial or inflammatory.[13] A trial court may use the jury selection process to help gauge the community climate.[14] A trial court's ruling on a motion for change of venue is reviewed for abuse of discretion.[15]
Although there was initially a significant amount of media coverage of the incident giving rise to Appellant's prosecution, coverage soon dropped off dramatically and was sparse in the following years. There was testimony that Appellant's case was not widely known or prominently recalled in the county and that the publicity was less than typical for the type of case involved. There was also testimony that any references to Appellant being "armed and dangerous" were when he was still at large and were always identified as statements made by the police and not as opinions of the media outlet. And there was testimony that the media reporting was accurate and objective. Finally, pretrial publicity did not appear to have any adverse effect on the selection of jurors, and the jurors that were selected were unaware of the case. The trial court did not abuse its discretion in denying the motion for change of venue. Point of error two is overruled.
III. MOTION FOR NEW TRIAL
A. The Motion
Appellant filed a motion for new trial alleging that the District Attorney engaged in violations of statute and due process by creating, or "willfully turn[ing] a blind eye" to, publicity surrounding the case. The motion alleged the following:
1) The provisions of Article 31.03(a) 2 of the Texas Code of Criminal Procedure, the right to due process and due course of law and the Movant's fair trial rights under both the federal and state constitutions were violated when the District Attorney clearly conspired to determine that the Movant Colone did not receive a fair trial in Jefferson County. The District Attorney's actions in both leaking information to the press on the opening day of trial via an untruthful jailhouse snitch under the Sheriff's control and in seeking to keep the case in Jefferson County so as to unfairly poison the jury pool during trial accomplished just that. Based upon the control over the jailhouse snitch that the District Attorney had, either they encouraged or directed the release of this *258 information, or turned a willfully blind eye to it coming out in the press at the start of the trial. This was a dangerous combination that deprived the defendant of his essential rights.
2) The District Attorney's introduction of unfair pre-trial publicity on the day of the opening of trial were clearly an effort to violate the provisions of Article 31.03 (a) 1, and Mr. Colone's rights to a fair jury trial, due process and due course of law under both the Federal and Texas State Constitutions ... regarding alleged threats to security of the jurors and the court in the local paper, which news items could have only come from the District Attorney. These actions were clearly designed to foster anger, fear, and create an atmosphere that would make a fair trial impossible.
3) Mr. Colone's rights to a fair jury trial, due process and due course of law under both the Federal and Texas State Constitutions were violated when the District Attorney deliberately tried to intimidate the jury by planting false stories in the press. Since they had determined their jailhouse snitch was not a credible enough source to subject to cross examination, the District Attorney's office then decided to offer his testimony via the press without exposing him to any testing. Such carefully leaked items were designed to guarantee a frightened jury which would be distracted from their duty to provide a fair and equitable trial or sentence of death to Mr. Colone.
4) The harm: These actions by the District Attorney directly affected jury selection. They directly affected jury deliberations on the question of future dangerousness when the jury determined punishment. They directly impacted their determination regarding mitigation. They directly contributed to an improper verdict and unjust sentence of death.
The motion contained a "prayer for hearing and relief" that asked the trial court to "set this matter for a hearing, permit evidence and testimony to be taken to develop this record," and to reverse the judgment of conviction and grant a change of venue. On the same page as the prayer, the motion contained a "certificate of presentment" that was signed by the trial judge. The motion also contained an order setting a hearing, which was not filled in and, on the same page, an order granting or denying the motion, with the trial judge circling the "DENIES" option and writing "Denied" in blank lines in the order.
The motion attached a news article and two affidavits from Appellant's attorneys to substantiate its allegations. The news article was titled, "Court receives threats as capital murder trial jury selection goes on." The affidavits set out three reasons for granting a new trial: (1) that the judge who signed an order authorizing the search of a cell phone or cell tower information later became the District Attorney and benefitted from the prior order,[16] (2) that the trial court reversed the initial granting of a change of venue, and (3) that a news article appeared "on the first day of trial, March 20, 2017" that referred to threats made against the court, judge, and staff, that this news article was the result of a leak by the District Attorney to the press, and that the information was from a jailhouse snitch who lacked credibility.
Regarding the newspaper article and the third allegation in the attorneys' affidavits, we observe that March 20th was the start of general voir dire. The judge's ruling on the motion to change venue occurred a *259 month later, on April 20th. Appellant did not raise this newspaper article at the April 20th hearing.
In connection with the first allegation, the affidavits alleged that the order allowing the search was unconstitutional. One of the affidavits acknowledged that "the prosecution backed away from directly using" the information but alleged, parenthetically and without specifying how or when, that the prosecution indirectly referred to the order. Defense counsel's affidavit also alleged that the order itself was "substantive evidence of wrong doing." At the April 20th hearing, the parties addressed some other matters aside from the motion to change venue, one of which included Appellant's motion to suppress the cell-phone information. The prosecutor said that he did not intend to bring up the cell-phone information in opening statement and would not bring it up through testimony without having a hearing on it first. One of the defense attorneys stated that he was satisfied with "holding off on hearing that motion right now." The defense never claimed at the April 20th hearing that the District Attorney committed misconduct in connection with the order for obtaining cell-phone information or that this had some relevance to the integrity of the jury.
With respect to the second allegation, one of the affidavits alleged that the twelfth juror seated knew Appellant and that this juror pointed defense counsel out to the rest of the jurors and laughed. The affidavit claimed that this juror was number twelve only because prospective juror Delafosse was excused over defense objection, and the affidavit proffered as a guess that Delafosse "spent more time at work during the trial than he spent at home." This affidavit also complained that another prospective juror was excused "simply because she was pregnant and due in June, an entire month post trial." Both affidavits complained that the defense tried to reach a plea deal "that was clearly going to be out of reach because the District Attorney made the decision to seek death based upon political considerations rather than a fair and objective evaluation of the case and the facts," but the attorneys stated that the District Attorney did offer a plea deal-a guilty plea in exchange for a life sentence. The attorneys concluded that this offer suggested that the District Attorney did not think that Appellant's case was death worthy. None of this information was proffered at the April 20th hearing, and the affidavit that talks about the twelfth juror does not contend that that information was newly-discovered after trial.
B. Analysis
In points of error seven and eight, Appellant complains that the trial court erred in failing to hold a hearing on his motion for new trial. He contends that affidavits from his defense attorneys showed "a powerful combination of influential people being present in the county who had determined the Appellant should die." He also contends that the affidavits show "due process violations by the District Attorney's office to spread misinformation and intimidate potential jurors."
The State contends that Appellant did not request a hearing on his motion for new trial and that Appellant "must do more than file a document labeled a "Certificate of Presentment." We think Appellant has done more here.
The State is correct that the mere filing of a "certificate of presentment" will not suffice to establish that a motion for new trial and request for a hearing has been presented to the trial court. But here, the trial court signed the certificate of presentment included in the motion for new trial, acknowledging his receipt of the document, *260 and the motion for new trial included a request for a hearing. By denying the motion for new trial, the judge denied the request for a hearing that was included in the motion.
However, Appellant has run afoul of a different error-preservation principle. A defendant may not raise a matter for the first time in a motion for new trial if he had the opportunity to raise it at trial.[17] By the time of the April 20th hearing, occurring after jury selection, the defense appears to have been aware of matters relating to the cell-phone data search, plea negotiations, the selection of jurors, and the reconsideration of the motion to change venue. The newspaper article to which Appellant refers had been published a month before. The affidavit describing the conduct of the twelfth juror does not say that this conduct came to the attorney's attention only after trial (or how that would have occurred) and, it would appear, along with other matters discussed in the affidavit, to be an event observed by the attorney during the proceedings. Because Appellant had the opportunity to raise the matters described in the attorneys' affidavits at trial, these matters were not timely raised in a motion for new trial.
Moreover, a party's affidavits must "specifically show[ ] the truth of the grounds of attack."[18] Bare assertions, without supporting factual allegations, are not sufficient to entitle a party to a hearing, and a trial court is not required to hold a hearing to conduct a "fishing expedition."[19] Appellant's affidavits made a number of bare assertions without alleging supporting facts to show that those assertions were true. Even if we assume that information about threats to court personnel came from a jailhouse snitch, the affidavits did not allege supporting facts to show that the information was untruthful or that the information was known to any member of the venire panel, much less to the members who served on the jury. Although there was a newspaper article suggesting that threats were made to court staff, no facts were alleged to show that any jurors were threatened, nor were any facts alleged to establish that the jurors were aware of the article or of any threats. The trial court was not required to engage in a fishing expedition based upon the self-serving speculation of Appellant's defense attorneys. Points of error seven and eight are overruled.
IV. JURY SELECTION
A. Excusal of Juror
In point of error nine, Appellant contends that the trial court erred when it excused prospective juror Delafosse after Appellant had exercised his peremptory strikes. Delafosse had been accepted as a juror by both parties, but he later learned that he had run out of funds to pay for his elderly mother's daily care and that he would have to personally care for her, at least for a while. In a hearing on April 12th, he explained that his mother was 84 and had dementia, Parkinson's disease, and COPD. He had been liquidating assets and had run out of funds faster than he had anticipated. He was trying to get Medicaid coverage and thought that could take three weeks to a month.[20]
*261 At the time of the April 12th hearing, twelve jurors had been chosen, and jury selection was continuing for the purpose of selecting alternates. The trial court excused Delafosse based on a statutory exemption for a primary caretaker. This meant that only eleven jurors had been selected, so one regular juror had to be selected in addition to alternates. At the time, the defense had two peremptory strikes left, and the State had five. The trial court gave each of the parties an extra peremptory strike.
A person who is qualified to serve as a juror may establish an exemption from jury service if the person is "the primary caretaker of a person who is unable to care for himself or herself."[21] The trial court has the power during jury selection to remove a prospective juror on the basis of an excuse, even if it is after the prospective juror has been questioned and accepted.[22] The trial court retains this power "in order to rectify problems created by such circumstances as, e.g., a venireperson's sudden realization that an excuse applies to her."[23]
Appellant contends that he was prejudiced because this was a "lynchpin juror," one he was really depending on. But a defendant "has no right that any particular individual serve on the jury. The defendant's only substantial right is that the jurors who do serve be qualified."[24] We perceive no error in the trial court's excusal of the juror, and even if there were error, we perceive no harm.[25] Point of error nine is overruled.
B. Batson Objection
In point of error ten, Appellant contends that the trial court erred in denying his Batson challenge to the State's exercise of a peremptory strike against prospective juror Simmons.
1. Questioning
When asked for her thoughts about the death penalty, Simmons said, "I don't know ... I guess I'm kinda mixed because I had a family member murdered, and the person ended up with lethal injection." She further stated that was a decision the family did not have to make and that "whatever the Courts decided was, you know, fine with us, which is-I'm not sure."
When asked to describe the incident in which a family member was murdered, Simmons explained that a man had separated from her cousin and was angry about it and came and stabbed the cousin and her children (eight and ten years old). The perpetrator then turned the gas on, trying to blow up the house. The cousin and one of the children died, but one of the children survived to testify.
Simmons was close to her cousin and attended the trial. When asked what outcome she had hoped for, Simmons replied, "I don't think-even as a family, I don't *262 think we hoped one way or the other. We just wanted him off the street and justice. I didn't feel one way or the other, I don't think, just as long as he wasn't around to hurt anybody else." The questioning revealed that the killer had been executed. When asked how she felt about that, Simmons replied, "Um, I don't know. Really kinda sad, because it was a life. I don't know. I don't know." When asked if she would have been as happy if the killer had gotten life in prison instead of the death penalty, Simmons responded, "Probably. Because, like I said, we just wanted him not to be able to walk the streets like nothing happened when he took, you know, the lives. And, so, as long as he wasn't around."
The prosecutor reminded Simmons of instructions during general voir dire that the death penalty depended on the juror's answers to two questions. The prosecutor then asked whether Simmons could be a juror if the evidence led her to answer those questions in such a way as to lead to the death penalty. Simmons answered, "I think I could." When further questioned, Simmons firmed up her answer and said, "Yes, I could." When asked why, Simmons said that the evidence would make her decide. The prosecutor further explained the Texas capital murder scheme as murder plus aggravating circumstances but with no need to prove premeditation. Simmons suggested that she was not opposed to the death penalty in that sort of scheme.
The defense asked Simmons no questions.
2. Peremptory Challenge, Defense Objection, and State's Response
The prosecutor exercised a peremptory challenge on Simmons. Appellant then lodged a Batson objection. Appellant pointed out that Simmons and Appellant were both African-American. Appellant contended that Simmons was a mid-range juror in terms of being favorable towards the defendant or the State and that she was a qualified juror.
The prosecutor contended that it had a race-neutral reason for the strike: "[T]his juror, her cousin and her child were murdered. And she expressed no interest in whether or not the person who murdered her family received a death penalty or not and almost expressed kind of an ambivalence towards the whole process." The prosecutor found this "of note" because Appellant's case also involved the killing of a mother and a child. The prosecutor further stated that Simmons was unsure about her feelings about the death penalty and read a statement from her written questionnaire that, "I have always had no clear opinion or feelings about the death penalty." The prosecutor also said that Simmons "didn't care enough about the murder of her own family to seek the death penalty." The prosecutor concluded, "[W]e would be concerned about her being able to return a verdict of death in the murder of a mother and daughter."
The trial judge overruled the Batson objection and asked if anything else needed to be taken up before recess. Defense counsel responded, "No, ma'am."
3. Analysis
In Batson v. Kentucky , the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the State from exercising a peremptory challenge against a juror on the basis of race.[26] A three-step process is used to analyze Batson claims: (1) the opponent of the peremptory challenge *263 must present a prima facie case of racial discrimination, (2) if that is done, the burden shifts to the proponent of the peremptory challenge to present a race-neutral reason for the challenge, and (3) if that is done, the trial court must then determine whether the opponent has proven purposeful racial discrimination.[27] We will assume that the State's allegation that it had race-neutral reasons for the peremptory challenge renders step one of the Batson analysis moot.[28] At step two, the proponent of the peremptory challenge need only tender an explanation that is racially neutral on its face.[29] If the explanation at the second step is determined to be race neutral, then at step three, the opponent of the peremptory challenge bears the burden of persuasion to show that the race-neutral explanation is not genuine (that the peremptory challenge was indeed a product of purposeful discrimination).[30]
A prospective juror's ambivalence about the death penalty is a race-neutral reason for a peremptory challenge.[31] The State's articulated concern about Simmons's lukewarm responses concerning the death penalty, in light of her personal experience of having relatives who were victims of capital murder, was race neutral and supported by the record. Appellant makes no attempt to show that this race-neutral explanation is not genuine or to show purposeful racial discrimination. Point of error ten is overruled.
V. ADMISSION OF EVIDENCE OF THE AGGRAVATED ROBBERY
In points of error three through six, Appellant contends that the trial court erred in admitting evidence that he committed the aggravated robbery that Mary talked to the police about. Appellant claims that the evidence was inadmissible hearsay because it consisted of out-of-court statements made by Mary and that his constitutional right to confrontation was violated because Mary was not available to be cross-examined. He also contends that the evidence was inadmissible under Rule 403 and that its admission violated his constitutional right to due process. With respect to these latter two claims, Appellant's challenge is essentially three-pronged: (1) that the only relevance for aggravated robbery was to show motive, which is not an essential element of murder, (2) that the probative value of the evidence was weak because it was hearsay and Appellant had no opportunity to test that evidence through cross-examination, and (3) that the evidence was prejudicial because it encouraged the jury to convict him on the basis of the uncharged aggravated robbery. We will assume that all of these claims were adequately preserved at trial.[32] We review *264 a trial court's decision to admit evidence for abuse of discretion.[33]
A. Out-of-Court Nature of the Statements and Forfeiture by Wrongdoing
Mary's statements to law enforcement about the aggravated robbery were made outside of court. The out-of-court nature of these statements is most directly relevant to points of error three and five, which involve Appellant's confrontation and hearsay claims, but it is also relevant to the second balancing factor we have identified in connection with points of error four and six, involving Appellant's due process and Rule 403 claims. We conclude that the out-of-court nature of the victim's statements cannot be relied upon by Appellant to obtain relief because of the doctrine of forfeiture by wrongdoing.
In Gonzalez v. State , we recognized the doctrine of "forfeiture by wrongdoing" and applied it to bar a Sixth Amendment confrontation claim.[34] We explained that the doctrine has been a part of common law since at least 1666.[35] Courts have widely accepted the doctrine to reject both hearsay and confrontation claims.[36] The doctrine is based on the principle that "any tampering with a witness should once [and] for all estop the tamperer from making any objection based on the results of his own chicanery."[37] Although we found some disagreement among various jurisdiction about the scope of the doctrine,[38] we concluded that it applied when evidence indicates that the defendant killed the victim and that the victim's death was motivated, at least in part, by the defendant's desire to permanently silence her and prevent her from identifying him.[39]
We conclude that Appellant's case falls within the doctrine as described by Gonzalez . The victim was killed two days after Appellant was indicted, and Appellant was heard accusing the victim of "telling on him." From this evidence, a rational trier of fact could conclude that Appellant's killing of the victim was motivated, at least in part, by a desire to permanently silence her in order to prevent her from testifying at a future aggravated robbery trial. Consequently, Appellant's confrontation claim is barred under Gonzalez.
The rationale for barring Appellant's confrontation claim also applies to the out-of-court component of his due process and Rule 403 claims. He cannot rely upon the out-of-court nature of the statements in the balancing analysis in connection with those claims.
That leaves the hearsay claim. Texas Rule of Evidence 802 states, "Hearsay is not admissible unless any of the following provides otherwise: • a statute; • these *265 rules; or • other rules prescribed under statutory authority."[40] There is currently a statute that prescribes a doctrine of forfeiture by wrongdoing,[41] but that statute applies only to offenses committed on or after September 1, 2013.[42] Because the offense in Appellant's case was committed in 2010, the statute does not apply. We are aware of no other statute or rule that would allow the doctrine of forfeiture by wrongdoing to trump the rule against hearsay.
Nevertheless, Gonzalez recognized the rule of forfeiture by wrongdoing as a rule of estoppel.[43] Rules of estoppel will bar relief even for a trial court ruling that violates a mandatory provision in a statute[44] and may even bar relief on what would otherwise be an absolute requirement.[45] Far from being an absolute requirement, hearsay is a rule that is forfeited by inaction, and Rule 802 specifically contemplates that when such a forfeiture occurs, the evidence "may not be denied probative value merely because it is hearsay."[46] Although the forfeiture here is not by inaction, it is by affirmative conduct, by Appellant himself, rather than just his attorney, and as such, logically relinquishes any right conferred by the hearsay rule. This view is consistent with the wide application of the doctrine of forfeiture by wrongdoing to hearsay as well as to confrontation claims. We conclude that the common-law doctrine of forfeiture by wrongdoing, as a doctrine of estoppel, trumps the hearsay rule even in the absence of a statute or another rule so providing.[47]
Points of error three and five, involving Appellant's confrontation and hearsay claims, are overruled.
*266 B. Subject Matter of the Statements and Relevance to the Case
Although the doctrine of forfeiture by wrongdoing bars Appellant from challenging statements about his prior commission of an aggravated robbery on the basis that those statements were made out of court, that doctrine does not prevent him from challenging the statements on the basis of their subject matter-that they describe an extraneous offense. To some degree, Appellant's Rule 403 and due process claims advance a Rule 404(b) contention-that evidence of an extraneous offense is being impermissibly offered to show his bad character.[48] It is the general rule that a defendant may be tried only for the offense charged and not for any other crimes or for being a criminal generally.[49]
But Rule 404(b) allows the admission of evidence of extraneous offenses for purposes other than character conformity.[50] Appellant does not raise a Rule 404(b) claim, and there is a very good reason for that omission- Rule 404(b) expressly allows evidence of extraneous offenses to show "motive."[51] Although motive "is not an element of murder, ... it is a circumstance indicative of guilt."[52] A witness's anticipated testimony that the defendant committed a prior offense can provide a motive to kill the witness.[53] Appellant cannot rationally claim that the evidence of his participation in the aggravated robbery was irrelevant-it was clearly relevant to show his motive to kill Mary.
So Appellant seeks to minimize the probative value of the aggravated-robbery evidence and to show that its probative value is outweighed by the danger of unfair prejudice. Rule 403 allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."[54] A Rule 403 analysis generally balances the following four factors, though they are not exclusive: (1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.[55]
*267 Appellant seeks to minimize the probative value of the evidence by claiming that motive is not an essential element of a criminal offense. It is true that motive is not an element of an offense, but it is also true that motive is highly relevant, so much so that we have said, on multiple occasions in the past, that the prosecution may "always" offer evidence to show motive.[56] Whether or not such statements are literally true, they indicate the importance of motive. Although motive is not by itself sufficient to show a crime, it is, even under the current evidentiary framework, a significant circumstance indicating guilt.[57]
Appellant contends that the extraneous-offense evidence had the potential to impress the jury in an irrational but indelible way because the State's case was circumstantial and the extraneous-offense evidence provided "a backstory that could not be tested by the defense." He points out that the assailant in the murder was masked and claims that the eyewitness testimony was erratic and contradictory. Appellant's effort to characterize the State's case as circumstantial or weak without the extraneous-offense evidence really serves to support the State on the fourth factor-the State's need for the evidence. That the evidence provides a "backstory" for the murder offense supports the State on the first factor-the probative value of the evidence. That leaves his claim that the evidence had the potential to impress the jury in an irrational way because it "could not be tested by the defense." But as we have already explained, that argument is foreclosed by the doctrine of forfeiture by wrongdoing.
Appellant claims that developing the evidence was time consuming because the State mentioned the extraneous offense in opening, found a way to at least mention the robbery with several witnesses, and called the detective to testify to Mary's verbal statements, her written affidavit, and the affidavit allegedly penned by Mary. Considering the importance of the evidence to demonstrate motive and to link a masked gunman to the crime, the time described here does not seem inordinate.
With regard to the fourth factor, the State's need for the evidence, Appellant contends that there was no need to introduce the evidence because motive was not an element of the offense and the State was pursuing a multiple-murder theory of capital murder rather than an obstruction or retaliation theory. It is true that the crime of obstruction or retaliation can be an underlying offense that elevates a murder to capital murder[58] and that Mary's reporting of the extraneous aggravated robbery to law enforcement would have been essential to establishing such an underlying offense.[59] It is also true that obstruction or retaliation was not an underlying *268 offense in Appellant's capital-murder indictment. Nevertheless, the aggravated robbery was relevant to establishing motive to murder Mary, and as Appellant's own briefing points out, his status as a masked assailant increased the State's need for the extraneous-offense evidence.
Although Briana was also murdered, her murder can be explained as deriving from a similar motive for murdering Mary: Having decided to kill Mary to remove her as a witness to the aggravated robbery, Appellant might likewise have seen the need to kill all those present with Mary to remove them as witnesses to her murder. The fact that he wore a mask reinforces the notion that Appellant was intentionally attempting to evade prosecution for the murder, as well for as the aggravated robbery.
That leaves Appellant's due-process claim. Citing Payne v. Tennessee ,[60] he contends that evidence can be so unduly prejudicial as to render a trial fundamentally unfair. Payne is not directly on point because it addressed the admissibility of victim-impact evidence.[61] Appellant also relies on Fifth Circuit caselaw setting forth a standard for determining whether admitting evidence of an extraneous offense satisfies due process.[62] Under that caselaw, admitting evidence of an extraneous offense satisfies due process as long as the government makes a "strong showing that the defendant committed the offense" and the extraneous offense is "rationally connected with the offense charged."[63] Assuming, without deciding, that the Fifth Circuit caselaw is correct, we conclude that the extraneous-offense evidence in the present case meets the articulated due-process standard. Appellant contends that the State has not made a strong showing that he committed the aggravated robbery because Mary's statements to the police were hearsay, but as we have previously discussed, this contention is barred by the doctrine of forfeiture by wrongdoing. Although he also contends that other witnesses to the aggravated robbery could not identify him, he does not point to anything that would undermine Mary's identification, and it appears that she knew Appellant. And, of course, the aggravated robbery was rationally connected to the capital murder because it supplied a motive for killing Mary. Moreover, our analysis of Appellant's Rule 403 claim supports the conclusion that the extraneous-offense evidence was not unfairly prejudicial.
As part of his due process claim, Appellant also argues that the Eighth Amendment requires a greater degree of accuracy and fact finding than would be true in a non-capital case. Even if that assertion is correct, he does not explain why Eighth Amendment jurisprudence should apply to a due-process claim attaching to the guilt stage of trial. Even if we accepted the application of Eighth Amendment jurisprudence to this context, we do not find Appellant's supporting arguments persuasive. He first contends that allowing this evidence would ensure that Appellant was convicted not on evidence establishing the charged offense but for other acts. Our analysis above answers this argument: the evidence relating to the aggravated robbery was highly relevant to show Appellant's guilt of the murder because it established his motive for the murder and helped identify him as the masked individual *269 who complained of Mary "telling on him." Appellant also contends that the evidence of the aggravated robbery was "tenuous and untested." This appears to be a reference to the out-of-court nature of Mary's statements, but as we have already explained, reliance on the out-of-court nature of the statements is barred in this case by the doctrine of forfeiture by wrongdoing.
Points of error four and six, involving Appellant's due process and Rule 403 claims, are overruled.
VI. DEATH-PENALTY CHALLENGES
In point of error eleven, Appellant contends that the trial court erred in denying his motion to declare the mitigation special issue unconstitutional. He contends that the mitigation issue is unconstitutional under Article 1, Sections 10 and 13 of the Texas Constitution because it unfairly shifts the burden of proof to the defense. We have previously rejected materially similar contentions.[64] In point of error twelve, he contends that the trial court erred in denying his objection to the "probability" language in the future-dangerousness special issue. He claims that this language conflicts with Apprendi v. New Jersey by lowering the burden of proof. We have previously rejected this contention.[65] For both points of error, "[i]t is also sufficient to dispose of such claims 'by recognizing that the trial court submitted a charge consistent with applicable state statutes, which have withstood numerous constitutional challenges.' "[66] Points of error eleven and twelve are overruled.
We affirm the trial court's judgment.

Fontenot testified that he covered up the bottom and top of the face on each photo and was able to identify Appellant by his eyes.

When asked whether Appellant "could not get a fair trial in Jefferson County," one of the other witnesses responded, "I believe that it's the opinion of many that he is already guilty."

Appellant cites the record reference to this email and (without discussing the contents) claims, "At some point later, it was determined that the case would be moved to Galveston County."

145 Tex. Crim. 536, 540-41, 170 S.W.2d 482, 485 (1943) (quoting 27 R.C.L. 825, § 46).

Id. at 542, 170 S.W.2d at 486. But the record need not reflect what the impropriety was. Id.

Id. at 538, 170 S.W.2d at 484.

Tex. Code Crim. Proc. art. 31.03(a)(1).

Buntion v. State , 482 S.W.3d 58, 71 (Tex. Crim. App. 2016) ; Salazar v. State , 38 S.W.3d 141, 150 (Tex. Crim. App. 2001).

Buntion , supra .

Id.

Schmutz v. State , 440 S.W.3d 29, 40 (Tex. Crim. App. 2014) ; Bell v. State , 938 S.W.2d 35, 46 (Tex. Crim. App. 1996).

Buntion , 482 S.W.3d at 71.

The District Attorney was Bob Wortham.

Id. at 78-79. See also Tex. R. App. P. 33.1 (complaint must be "timely").

King v. State , 29 S.W.3d 556, 569 (Tex. Crim. App. 2000).

Id.

The jury was sworn and testimony began on April 25.

Tex. Gov't Code § 62.106(a)(7).

Rousseau v. State , 855 S.W.2d 666, 676-77 (Tex. Crim. App. 1993).

Id. at 677. See also id. at 676 ("The questioned veniremember established that she was the mother of three minor children, ages three, nine, and eleven, and had to be home at a certain time or would run the risk of leaving her children inadequately supervised.").

Jones v. State , 982 S.W.2d 386, 393 (Tex. Crim. App. 1998).

See id. at 394 (referring to a "policy" courts should follow: "the liberal granting of challenges for cause" and holding that "the erroneous excusing of a veniremember will call for reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury").

476 U.S. 79, 85-86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Blackman v. State , 414 S.W.3d 757, 764 (Tex. Crim. App. 2013) (quoting from Purkett v. Elem , 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) ).

Watkins v. State , 245 S.W.3d 444, 447 & n.11 (Tex. Crim. App. 2008).

Blackman , 414 S.W.3d at 764-65 (citing Purkett , 514 U.S. at 767-68, 115 S.Ct. 1769 ).

Id.

Jasper v. State , 61 S.W.3d 413, 422 (Tex. Crim. App. 2001).

To show preservation, Appellant points to a written motion, to a pretrial hearing, and to the granting of a running objection at trial. The written motion complained that the evidence was inadmissible as an extraneous offense for various reasons. That motion was specifically denied at the hearing. The trial judge also discussed hearsay and confrontation issues surrounding the evidence and concluded that the evidence was nevertheless admissible. See Tex. R. Evid. 103(a)(1). See also Tex. R. App. P. 33.1 (party making complaint must have "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."). It is not clear that Appellant actually preserved each basis for the complaint he makes on appeal. In order to avoid a lengthy and complicated preservation analysis, we assume, without deciding, that he did.

Beham v. State , 559 S.W.3d 474, 478 (Tex. Crim. App. 2018).

195 S.W.3d 114 (Tex. Crim. App. 2006).

Id. at 117.

Id. at 120.

Id. at 117 (quoting 5 John H. Wigmore, Evidence § 1406 at 219 (Chadbourn rev. 1974). See also id. ("In other words, the rule is based on 'common honesty' and the maxim that 'no one shall be permitted to take advantage of his own wrong.' ") (quoting from Reynolds v. United States , 98 U.S. 145, 159, 25 L.Ed. 244 (1878) ).

Id. at 120.

Id. at 126.

Tex. R. Evid. 802.

Tex. Code Crim. Proc. art. 38.49.

Acts 2013, 83rd Leg., ch. 165 (S.B. 1360), §§ 4, 5.

See supra at n.37 and accompanying text.

See Deen v. State , 509 S.W.3d 345, 348 (Tex. Crim. App. 2017) ("The argument that a conviction is void because the sentence is not authorized by the Legislature is subject to principles of estoppel."); Prystash v. State , 3 S.W.3d 522, 529-32 (Tex. Crim. App. 1999) (defendant barred from complaining about omission of special issue in death penalty case when he invited its omission).

Gutierrez v. State , 380 S.W.3d 167, 177 (Tex. Crim. App. 2012) ; Saldano v. State , 70 S.W.3d 873, 888 (Tex. Crim. App. 2002) ("We have held that a party may be estopped from relying on an absolute requirement.").

Tex. R. Evid. 802.

As in Gonzalez , we decline to further explore the contours of the common-law doctrine of forfeiture by wrongdoing beyond what is needed to decide the present case. See 195 S.W.3d at 126. The legislature, of course, is free to promulgate a forfeiture-by-wrongdoing doctrine in statute that is broader than the common law, at least insofar as it would trump the rule against hearsay.
We also note that there is a reasonable argument that a victim's report of a prior crime to law enforcement would be admissible for the non-hearsay purpose of proving that the report itself motivated the defendant to murder the victim. See Commonwealth v. Young, 561 Pa. 34, 53-55, 748 A.2d 166, 176-77 (1999) (op. on orig. subm'n), different results reached on reh'g on a different claim (2000); State v. Blackburn , 271 S.C. 324, 326-30, 247 S.E.2d 334, 336-38 (1978) ; Dednam v. State , 360 Ark. 240, 242-48, 200 S.W.3d 875, 877-80 (2005). Holding the evidence admissible for a nonhearsay purpose could give rise to other issues, such as whether a limiting instruction is required, whether the probative value of the nonhearsay purpose must be weighed against the prejudicial impact of the potential hearsay effect under Rule 403, and the admissibility of such evidence at punishment. Given our holding on forfeiture by wrongdoing, we need not address those issues in Appellant's case.

See TEX. R. EVID. 404(b)(1) ("Prohibited Uses . Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

Segundo v. State , 270 S.W.3d 79, 87 (Tex. Crim. App. 2008).

TEX. R. EVID. 404(b)(2).

Id.

Ingerson v. State , 559 S.W.3d 501, 510 (Tex. Crim. App. 2018). See also Guevara v. State , 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Motive is a significant circumstance indicating guilt.").

See Fritts v. State , 119 Tex. Crim. 412, 415, 42 S.W.2d 609, 611 (1931) ("The state is warranted in proving the relation of the deceased to a former case if it furnishes a reason for ill-will on the part of accused toward deceased. As stated by Mr. Branch, in his Annotated Penal Code, sec. 1880, 'a former indictment against defendant charging him with a separate offense from the one for which he is on trial may be put in evidence to show motive when it tends to support the theory that defendant intended to prevent adverse disclosures by deceased who was a witness against him.' "). See also Campbell v. State , 545 S.W.2d 791, 796 (Tex. Crim. App. 1977) (defendant's motive for murder was that he was hired to kill victim in order to prevent him from testifying in pending criminal cases).

TEX. R. EVID. 403.

Shuffield v. State , 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

Crane v. State , 786 S.W.2d 338, 350 (Tex. Crim. App. 1990) ; Stoker v. State , 788 S.W.2d 1, 13 (Tex. Crim. App. 1989) ; Wallace v. State , 679 S.W.2d 1, 4 (Tex. Crim. App. 1984) ; Bush v. State , 628 S.W.2d 441, 444 (Tex. Crim. App. 1982) ; Porter v. State , 623 S.W.2d 374 (Tex. Crim. App. 1981). Some of these cases predate even the first iteration of the rules of evidence, becoming effective in Texas criminal cases on September 1, 1986. See Tex. R. Crim. Evid. , table of contents (West 1990).

Nisbett v. State , 552 S.W.3d 244, 265 (Tex. Crim. App. 2018).

Tex. Penal Code § 19.03(a)(2) ("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or attempting to commit ... obstruction or retaliation.").

Id. § 36.06(a) (addressing acts to obstruct or retaliate when another person is "a witness, prospective witness, or informant" or "has reported or who the actor knows intends to report the occurrence of a crime").

501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

Id.

See Story v. Collins , 920 F.2d 1247, 1254 (5th Cir. 1991).

Id.

Soliz v. State , 432 S.W.3d 895, 904-05 (Tex. Crim. App. 2014) ; Green v. State , 912 S.W.2d 189, 195 (Tex. Crim. App. 1995).

Rayford v. State , 125 S.W.3d 521, 534 (Tex. Crim. App. 2003).

Davis v. State , 313 S.W.3d 317, 355 (Tex. Crim. App. 2010).