

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00326-CR

Kevin Deshon **FOSTER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR6383
Honorable Melisa C. Skinner, Judge Presiding

Opinion by:　Liza A. Rodriguez, Justice

Sitting:　　Rebeca C. Martinez, Justice
　　　　　　Patricia O. Alvarez, Justice
　　　　　　Liza A. Rodriguez, Justice

Delivered and Filed: August 14, 2019

AFFIRMED

Kevin Deshon Foster appeals the trial court's judgment convicting him of two counts of aggravated robbery as a repeat offender and sentencing him to thirty-five years of imprisonment on both counts to run concurrently. At trial, the complainant made an in-court identification of Foster as one of the two men who committed an aggravated robbery at The Cash Store on April 21, 2016. On appeal, Foster argues (1) the trial court abused its discretion in admitting fingerprint evidence identifying him; (2) the complainant's in-court identification of him was tainted by an

impermissibly suggestive pretrial identification procedure; and (3) the trial court erred in denying his *Batson* challenge. We affirm.

## I. Fingerprint Evidence

In his first and second issues, Foster argues the trial court abused its discretion in admitting fingerprint evidence because the evidence failed to meet the admissibility requirements of Texas Rule of Evidence 702 and *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).[1] Specifically, Foster contends the fingerprint evidence was not reliable and the expert who testified about the evidence was not qualified. *See Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005). "No rigid formula exists for determining whether a particular witness is qualified to testify as an expert." *Acevedo v. State*, 255 S.W.3d 162, 171 (Tex. App.—San Antonio 2008, pet. ref'd) (quoting *Matson v. State*, 819 S.W.2d 839, 851-52 n.10 (Tex. Crim. App. 1991)). "A witness may be qualified by reason of knowledge, skill, experience, or training, regardless of its source." *Id.* (quoting *Matson*, 819 S.W.2d at 851-52 n.10).

At a hearing outside the presence of the jury, Estella Navejas testified she has worked for the Texas Department of Public Safety Crime Lab for twenty years and has over twelve years of experience working with fingerprints (three years as a fingerprint examiner and now over nine years as a latent print examiner). Although Navejas has only a high school diploma, she testified that she has had extensive on-the-job training, including completing a one-year training program in fingerprint identification and attending multiple courses on fingerprint analysis (i.e., a forty-hour latent print examination course, a thirty-six-hour advanced latent print examination course, and a twenty-four-hour palm print comparison course provided by the FBI). According to Navejas,

---

[1]In his brief, Foster also states in a conclusory fashion that the fingerprint evidence violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the Constitution, and sections 10, 13, and 19 of article 1 to the Texas Constitution. Foster, however, does not adequately brief how these constitutional rights were violated and thus has waived any error. *See* TEX. R. APP. P. 38.1(i).

she has been tested annually by the American Society of Crime Lab Directors Laboratory Accreditation Board and has passed every time. She has been trained on the Automated Fingerprint Identification System (AFIS), which she testified "is a computer-based system for matching, searching, reading and categorizing fingerprints and palm prints," and now trains other law enforcement agencies how to use AFIS and the FBI database. Navejas's testimony exhibited her training and experience with regard to examining fingerprint evidence. We find no abuse of discretion by the trial court in finding Navejas qualified to render an expert opinion on the fingerprint evidence. *See Acevedo*, 255 S.W.3d at 171.

Foster also argues that the fingerprint evidence was unreliable under Texas Rule of Evidence 702 and *Kelly*. The proponent of scientific evidence bears the burden of demonstrating by clear and convincing evidence that the evidence is reliable by showing that (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question. *Jenkins v. State*, 493 S.W.3d 583, 601-02 (Tex. Crim. App. 2016). Navejas testified that fingerprints are permanent and unique; each finger has its own specific and unique pattern arrangement. "[N]o two people have ever been known to have the same two prints." According to Navejas, "almost everybody" in the fingerprint community uses the ACE-V method to analyze fingerprints; ACE-V stands for analysis, comparison, evaluation, and verification of fingerprints. Navejas testified the ACE-V method has an error rate of less than one percent. She explained that under the ACE-V method, an examiner first checks to see whether the print is suitable for comparison or even entry into the AFIS database, which consists of over fourteen million known sets of fingerprints. The examiner then performs a complete examination, taking the point the examiner has found in common in one print and comparing the point to known fingerprints to see if there is a potential match. Once the examiner decides whether there is a match, a second examiner performs the same examination, separate and apart from the first examiner, and

verifies the results of the first examiner. Navejas testified that the generally accepted number of points needed to identify a fingerprint is eleven, but that the number of actual points needed for a match depends on the size of the print.[2] In this case, Navejas testified she found fourteen "plus" points, meaning that there could be more points in common but Navejas did not mark them because she determined she had a sufficient number of points for the examination. After hearing Navejas's testimony, the trial court overruled Foster's objection.

During her testimony before the jury, Naveja testified that four fingerprint cards were submitted in this case to the DPS Crime Lab, and she determined one latent print, which was almost full print, was suitable for examination. She then gave the print to another latent print examiner, who confirmed it was a suitable print. According to Naveja, she submitted the latent print to the AFIS system. Once she got the latent print in the computer system, she was able to mark forty-two points. Out of its database of over 14 million known fingerprints, AFIS then sent a list of the twenty most common matches for the print. Navejas then compared the latent print to the list of the twenty candidates. Navejas concluded that the latent print matched the known print of Kevin Foster. Her results were then verified by another examiner.

In his brief, Foster emphasizes that Navejas admitted there are no scientific peer review studies with respect to fingerprints and that fingerprint analysis has resulted in misidentifications. However, while Foster did not know of any peer review studies, she did testify about peer review of her results and those from her lab. According to Foster, the ASCLD checks the results of her lab by randomly selecting cases and verifying the results given by the lab. Based on our review of

---

[2] In his brief, Foster argues that because Navejas testified her lab generally requires eleven points but that the national standard is lower, there is no standard accepted by the scientific community. Navejas, however, explained that there is no set standard because the number of points needed on a fingerprint is dependent on the size of the print received by the lab: "It's impossible to know because each latent is different, each impression is a chance impression, so you can have a whole lot of print–a whole lot of the print or very little of it. So depending on the size that you receive, depends [on] how many points you can get on there."

the record, we conclude the trial court did not abuse its discretion in determining that the fingerprint-comparison evidence was reliable under *Kelly*. *See Russeau*, 171 S.W.3d at 883 (holding that based on the evidence in the case and the court of criminal appeals's "own well-established history" of accepting fingerprint evidence, the trial court did not abuse its discretion in admitting the evidence).

## II.      In-Court Identification

In his third issue, Foster argues the trial court erred in overruling his objection to the complainant Sarah Ann Pena's in-court identification of him, because a pretrial photo array was impermissibly suggestive in violation of his constitutional rights. "[A] pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001) (citing *Stovall v. Denno*, 388 U.S. 293 (1967)). To determine the admissibility of an in-court identification, courts apply a two-step analysis: 1) whether the out-of-court identification procedure was impermissibly suggestive; and, if suggestive, 2) whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *Id.* (citing *Simmons v. United States*, 390 U.S. 377 (1968)). "An analysis under these steps requires an examination of the 'totality of the circumstances' surrounding the particular case and a determination of the reliability of the identification." *Id.*; *see also Gamboa v. State*, 296 S.W.3d 574, 581-82 (Tex. Crim. App. 2009). In reviewing a trial court's legal determination of whether the reliability of an in-court identification has been undermined by an impermissibly suggestive pretrial identification procedure, an appellate court applies a de novo standard of review. *Gamboa*, 296 S.W.3d at 581.

In considering the first prong of whether the out-of-court identification procedure was impermissibly suggestive, we note Foster specifically complains that all the photos in the photo

array have two black boxes covering (1) the neck of each man and (2) a small portion underneath an eye of each man. Detective Sheila Vitacco testified she identified Foster as a suspect due to the latent fingerprint found at the scene of the robbery at The Cash Store in Universal City, Texas.[3] In compiling the photo array used, five other photos were selected on the basis of age, gender, race, similar hairstyles, and other similar features. Because Foster had a tattoo on his neck and underneath his eye, Detective Vitacco placed black boxes on all six photos in the same location. According to Detective Vitacco, Sarah Ann Pena, an employee of The Cash Store and one of the complainants in this case, identified Photo No. 5, which was a photo of Foster.

Pena similarly testified that six weeks after the robbery, she was shown a photo array by a detective. She was shown the photos one at a time and was told to take her time. Pena testified at trial that she believed she asked the detective "why the blocks were like that," and the detective said the boxes "could be hiding other features." However, according to Pena, the detective never mentioned tattoos. Pena identified Photo No. 5 (which was a picture of Foster) as one of the men who committed the robbery and wrote on the back of the photo that she was 75% certain in her identification. Months later, she received a letter from the detective informing her they had "caught" Foster. At trial, Pena identified Foster as one of the men who committed the aggravated robbery. When asked to describe the features that led her to identify Foster, Pena testified she remembered his teardrop tattoo. When asked if the teardrop tattoo was the basis for her identification of Foster, Pena replied that it was not the only reason—that she "remembered distinctively how he looked."

Because Pena did not include any descriptions of tattoos in her original statement to police, Foster argues Pena was impermissibly tainted by the photo array and the letter from the detective

---

[3] The robbery was recorded by surveillance video.

informing her Foster was the suspect. In considering the totality of the circumstances, however, we do not find the pretrial procedure impermissibly suggestive. Pena testified that after she received the letter from the detective, she did not search for any information on Foster. Further, the evidence shows all six photos in the array had the same black boxes in the same locations. The photos were shown to Pena one at a time. Pena was adamant at trial that neither the detective nor anyone else suggested to her in any way who to identify. While Foster argues Pena testifying at trial about the tattoo was the result of an impermissibly suggestive pretrial procedure, Pena was clear in her testimony that no one told her about Foster's tattoo and that she remembered the detail from her own memory. She testified she had not put the detail in her original police report because she had "never been in this type of situation" before. At trial, she was certain that Foster was one of the men who committed the aggravated robbery, explaining that she has a "very good memory." Finally, we have reviewed the photo array in the record and find nothing, in and of itself, to indicate it was impermissibly suggestive.

Moreover, even if we had determined that the out-of-court identification procedure was impermissibly suggestive, under the second prong of the analysis, we conclude that any such suggestive procedure did not give rise to a substantial likelihood of irreparable misidentification. *Conner*, 67 S.W.3d at 200. "Reliability is the linchpin in determining the admissibility of identification testimony." *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008). In "assessing reliability under the totality of the circumstances," the following "five non-exclusive factors should be weighed against the corrupting effect of any suggestive identification procedure": (1) the witness's opportunity "to view the criminal at the time of the crime"; (2) the witness's "degree of attention"; (3) "the accuracy of the witness's prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the time of confrontation";

and (5) "the length of time between the crime and the confrontation." *Id*.; *see also Gamboa*, 296 S.W.3d at 582.

In applying these factors, we note that both the surveillance video and Pena's testimony show that she was in close contact with the two men who committed the aggravated robbery. Pena testified that at the time of the robbery, she got a very good look at Foster and paid close attention. Although Foster emphasizes that Pena did not describe any tattoos in her statement to police at the time of the robbery, Pena was clear in her trial testimony that she remembered the tattoo from her own memory and did not put the detail in her first statement to police because she had never made a statement before. Pena first identified Foster in the photo array only six weeks after the robbery, indicating she was 75% certain. Although it had been two years since the robbery at the time of her trial testimony, Pena was unwavering of her identification of Foster. We therefore hold the trial court did not err in overruling Foster's objection to Pena's in-court identification.

### III.    *Batson Challenge*

In his final issue, Foster argues the trial court erred in denying his *Batson* challenge to the State's striking of a black venireperson. In *Batson v. Kentucky*, 476 U.S. 79, 97-98 (1986), the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the State from exercising a peremptory challenge against a juror on the basis of race. A three-step process is used to analyze claims under *Batson*:

(1) the opponent of the peremptory challenge must present a *prima facie* case of racial discrimination;

(2) if there is *prima facie* case shown, the burden shifts to the proponent of the peremptory challenge to present a race-neutral reason for the challenge; and

(3) if there is a race-neutral reason for the challenge, the trial court must then determine whether the opponent has proven purposeful racial discrimination.

*Colone v. State*, 573 S.W.3d 249, 262-63 (Tex. Crim. App. 2019). "The trial court's ruling in the third step must be sustained on appeal unless it is clearly erroneous." *Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010). "Because the trial court's ruling requires an evaluation of the credibility and demeanor of prosecutors and venire members, and because this evaluation lies peculiarly within the trial court's province, we defer to the trial court in the absence of exceptional circumstances." *Id.*

With regard to the first step of the analysis, Foster presented a *prima facie* case by showing the State had struck Juror No. 7, a black venireperson. Under the second step, the burden then shifted to the State, which responded with the race-neutral reason of "education level." According to the State, it was seeking jurors with a higher education level than Juror No. 7's high-school education. Under the third step, Foster argued that the State's reason was pretextual because it had accepted other jurors who also only had a high-school education but were not black. *See Colone*, 573 S.W.3d at 263 (explaining that "[i]f the explanation at the second step is determined to be race neutral, then at step three, the opponent of the peremptory challenge bears the burden of persuasion to show that the race-neutral explanation is not genuine" and "the peremptory challenge was indeed a product of purposeful discrimination"). The State responded that it had liked those jurors for other reasons. For example, it had kept Juror No. 20, who was a cashier at a grocery store, because it believed her experience as a cashier would make her a better juror under the facts of this case, which involved an armed robbery of a clerk. The State stated it had also kept Juror No. 22 for the same reason—Juror No. 25 was a cashier. It had kept Juror No. 25, even though he only had a high school diploma, because he had a family member who had been a victim of a robbery. The State pointed out it had picked jurors with higher education levels (the highest level of education being a doctorate), emphasizing the first five jurors selected included a department manager, a registered

nurse, a pharmacist, and an analyst. Based on this record, we do not find that the trial court's ruling was "clearly erroneous." *See Grant*, 325 S.W.3d at 657.

Having concluded that the trial court did not err in (1) admitting fingerprint evidence; (2) allowing Pena to make an in-court identification; and (3) denying Foster's *Batson* challenge, we affirm the judgment of the trial court.

Liza A. Rodriguez, Justice

Do not publish