**Affirm and Opinion Filed July 29, 2022**

# S

**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00968-CR**

**JOSE DOMINGUEZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 86th Judicial District Court**
**Kaufman County, Texas**
**Trial Court Cause No. 19-10909-86-F**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Nowell
Opinion by Justice Nowell

A jury convicted Jose Dominguez of aggravated assault with a deadly weapon causing serious bodily injury, involving family violence, and he was sentenced to forty years' incarceration. In two issues, appellant argues the evidence is insufficient to support the deadly weapon finding and the trial court erred by finding forfeiture by wrongdoing. We affirm the trial court's judgment.

## A. Sufficiency of the Evidence[1]

Appellant argues the evidence is insufficient to support a finding that he used a deadly weapon during the commission of the assault. When reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). The verdict will be upheld if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Edward*, 635 S.W.3d at 655. "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The jury is the sole judge of the weight and credibility of the evidence. *Edward*, 635 S.W.3d at 655. When considering a claim of evidentiary insufficiency, we must keep in mind that a juror may choose to believe or disbelieve all, some, or none of the evidence presented. *Id.* Further, while jurors may not base their decision on mere speculation or unsupported inferences, they may draw reasonable inferences from the evidence. *Id.*

---

[1] Although appellant's first issue states that he is challenging the factual and legal sufficiency of the evidence, factual sufficiency review was abolished in *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). Accordingly, we limit our consideration of appellant's first issue to the legal sufficiency of the evidence.

As applicable here, a person commits aggravated assault if he commits assault and uses or exhibits a deadly weapon during the commission of the assault. *See* TEX. PENAL CODE ANN. § 22.02(a)(2). Aggravated assault is a felony in the first degree if "the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury" to a person with whom he is in a dating relationship or to whom he is married. *See id.* § 22.02(b)(1); *see* TEX. FAMILY CODE §§ 71.0021(b), 71.003. A deadly weapon includes "anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17). Serious bodily injury means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

To determine whether a weapon is a deadly weapon, we may consider (1) any words or threatening actions by the defendant, including his proximity to the victim, (2) the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon, and (3) the manner in which the defendant used the weapon. *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017). These are, however, merely factors used to guide a court's sufficiency analysis and are not "inexorable commands." *Id*. In *Johnson*, the court of criminal appeals considered whether a butter knife used or exhibited during a convenience store robbery was a

–3–

deadly weapon. Because of the defendant's proximity to victims, his threats to harm, and victim testimony that the knife was capable of causing serious bodily injury, the court concluded the jury could have reasonably inferred it was capable of causing serious bodily injury or death. *Id*. at 324.

Ashley Breland lived in a house with appellant and seven children. Breland and appellant were in a common-law marriage or a long-term dating relationship. On the night of September 8, 2019, Breland called 911 and reported appellant had stabbed her with a pair of scissors and he refused to leave her house. The children fled to a neighbor's house. One of the children, a thirteen year old boy, told the neighbor, Jerry Ytuarte: "Joe stabbed my momma." When Breland came to Ytuarte's house, Ytuarte saw the wound and blood on her arm.

Breland told Joshua Phillips, patrol sergeant for the Kaufman County Sheriff's Office, that she and appellant had been fighting all day. Eventually appellant picked up some scissors and stabbed her in the arm. Breland also provided a written statement to Phillips, which he read to the jury:

> In the morning Joe had choked me in the laundry room. In the night time, he came in my room after waking me up and was just upset about multiple things. We argued [b]ack and forth and I asked him to leave me alone and get out. I told him I was going to call the cops and he told me do I know what will happen to me when he gets out if I do[.] [T]hen he choked me quickly and grab[b]ed [scissors] of[f] the desk next to us and hit my arm and I started bleeding[.]

–4–

The scissors were "safety scissors" with rounded ends for children's use. Phillips described them as being six-to-eight inches long. The jury saw photographs of the scissors and Breland's injuries.

Breland indicated appellant had assaulted her multiple times in the past. She had not reported the previous acts of violence because appellant threatened her with what would happen "when I get out."

The emergency medical technician who treated Breland in the ambulance testified that Breland did not have any immediately life threatening injuries. However, the technician checked to see how deep the scissors penetrated into Breland's arm, whether the scissors "hit any muscle tissue or tendons," and whether Breland could feel her fingers "because you don't know what you're going to hit, you know, at any point in your body, and whether there was anything in the wound. And you've got nerves and muscles that run down all sides. You got nerves that branch off here and, you know, somebody could hit one of those." When Breland told the technician that the wound was caused by safety scissors, the technician thought there "was a lot of force that was put into that. Those are made for children that fall on scissors. And for it to penetrate her skin like it did, it was made with force." The technician took pictures of numerous bruises on Breland's body, including on her neck, that Breland said were from appellant.

Viewing this evidence in the light most favorable to the verdict, we conclude the evidence is sufficient to show the scissors used by appellant were capable of

causing serious bodily injury in the manner appellant used them and, thus, the evidence is sufficient to support the finding that they were used as a deadly weapon. *See Johnson*, 509 S.W.3d at 323-24; *see also Snowdy v. State*, No. 05-18-00643-CR, 2019 WL 3886653, at *2 (Tex. App.—Dallas Aug. 19, 2019, no pet.) (mem. op., not designated for publication) (concluding a sharpened plastic spoon brandished at jail officials was a deadly weapon). The evidence shows that appellant choked Breland and then forcefully stabbed her with the six-to-eight inch long scissors. The scissors when used in this manner could hit a tendon, nerve, or muscle and could cause a person such as Breland to lose feeling in her fingers. Breland told both the EMT technician and Phillips that appellant had physically attacked her before, and they both saw the bruises on her body, including around her neck. Appellant threateningly told Breland that it did not matter whether he went to jail because he would come back. Based on our review of the record, we conclude the evidence is sufficient to sustain the deadly weapon finding in this case. We overrule appellant's first issue.

### B. Forfeiture by Wrongdoing

In his second issue, appellant argues the trial court erred by finding forfeiture by wrongdoing. Based on its ruling, the trial court admitted Breland's written statement made on the night of the assault and verbal statements to the EMS technician even though Breland did not appear at trial.

Under the doctrine of forfeiture by wrongdoing, a defendant is barred from asserting his right of confrontation or complaining about hearsay when he has

wrongfully procured the witness's unavailability. *See Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019). The doctrine is based on the principle that "any tampering with a witness should once [and] for all estop the tamperer from making any objection based on the results of his own chicanery." *Gonzalez v. State*, 195 S.W.3d 114, 117 (Tex. Crim. App. 2006). The doctrine has been codified in the Texas Code of Criminal Procedure, which provides:

> (a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:
> (1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and
> (2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.
> (b) Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing under this article, subject to Subsection (c).
> (c) In determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence. If practicable, the court shall make the determination under this subsection before trial using the procedures under Article 28.01 of this code and Rule 104, Texas Rules of Evidence.
> (d) The party offering the evidence or statements described by Subsection (b) is not required to show that:
> (1) the actor's sole intent was to wrongfully cause the witness's or prospective witness's unavailability;
> (2) the actions of the actor constituted a criminal offense; or
> (3) any statements offered are reliable.

TEX. CODE CRIM. PROC. ANN. art. 38.49.

–7–

A decision whether to admit evidence is a matter within the trial court's discretion, and the decision will not be reversed in the absence of an abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537–38 (Tex. Crim. App. 2002). If there is evidence to support the trial court's decision to admit evidence, there is no abuse of discretion, and we must defer to that decision. *Id*. at 538.

Before trial, the State filed a motion for a finding of forfeiture by wrongdoing, and the trial court held a hearing on the motion.

When Joshua Phillips met Breland on the night of the assault, he completed a family violence packet, and Breland made a written statement. The witness statement and family violence packet were admitted at the hearing. Phillips read Breland's statement, which is quoted above, into the record.

Breland told Phillips that appellant assaulted her multiple times in the preceding twelve months and as recently as the previous weekend. In addition to the puncture wound on her arm, Phillips noticed bruising on Breland's body, including on her arms and around her neck. Appellant had threatened to kill her dogs and burn her house. Breland's demeanor was "[a]fraid, apologetic, and crying."

Explaining why she had not previously reported appellant's violence, Breland stated that, on multiple occasions, appellant had threateningly told her that it did not matter whether she called the police because "you know, what I'll do when I get out." Ytuarte also reported that, on the night of the assault, appellant threatened

Breland and him saying: "Call the cops. You know what I'll do when I get out. I'm not afraid to go back."

On October 28, 2019, Daniel Hargrove, a felony investigator for the district attorney's office in Kaufman County, and a prosecutor went to Breland's residence. They called her when they arrived, but she did not answer her phone. Hargrove testified: "[s]he finally answered and came outside but very hesitantly and looked to her left and right as to whether or not it looked like somebody might be watching our actions while we were there." A gate surrounded her house, and Breland spoke to them from inside the gate. When Hargrove asked if they could speak inside her home as the weather was misty rain, "[s]he was very adamant about no. She was hesitant to even continue talking to us outside at the gate by the road." Hargrove returned to Breland's residence in March 2020. Breland came outside "and this time was more agitated and upset that I was there trying to talk to her." Breland told him that "she was wanting to get out of here, get finished with this, and leave. She was trying to sell the place." After that, Breland cut off communication with Hargrove; she stopped answering or returning his phone calls and emails. Hargrove continued trying to contact Breland via email, telephone, and Facebook and by going to her property again to serve a subpoena to appear at trial; Breland did not respond.

In September 2020, Hargrove learned Breland moved to Oklahoma. In October, Hargrove located Breland in Oklahoma and found a new phone number for her. When he called her new number, no one answered. He contacted relevant

authorities in Oklahoma to have a subpoena served, but the authorities were unsuccessful in obtaining service.

After appellant was arrested, a protective order was put into place. Even so, during appellant's first week in jail, he called Breland eighty six times. Hargrove testified there were "an astronomical amount of phone calls" between appellant and Breland while appellant was in jail awaiting trial. During the first week, appellant acknowledged on the phone that there was a protective order in place and he was not supposed to be talking to her; however, he asked Breland several times to have the protective order lifted. He also asked her to help him post bail. Breland repeatedly asked appellant whether he knew that she had added money to his account for the phone calls.

The first week appellant was incarcerated, Breland told appellant that she had talked to a detective. Appellant replied that "if they told the detective of any abuse, that he'd be fucked." Appellant told Breland she did not have to talk to the district attorney's office, and the district attorney would try to coerce her into making a statement. He also told her: "I'm your husband. I take care of you. Our stories need to coincide. You don't need to lie. Tell the truth about this. We've never had any police calls out here."

On several occasions, appellant also asked her to complete an affidavit of non-prosecution, but Breland never did. During a March 5, 2020 phone call, appellant said: "What I need you to do is go sign that fucking affidavit of non-prosecution."

They then discussed selling the house and appellant told Breland: "Just send me the fucking paperwork. Get the hell out of Dodge." The trial court listened to this phone call. On June 3, 2020, appellant told Breland: "Don't nobody want to see you. You know what I mean, right? As long as you don't come, they ain't got shit."

Appellant argues there is no evidence linking his wrongdoing to Breland's absence at trial. We disagree. The evidence shows Breland was afraid of appellant, appellant repeatedly threatened Breland about his return to her when he was released from jail, and he had abused her repeatedly. Appellant contacted Breland dozens of times in knowing violation of a protective order, he told her their stories needed to "coincide," he repeatedly told her to execute an affidavit of non-prosecution, he told her to sell the house and "[g]et the hell out of Dodge," he told her that no one wanted to see her, and he said that as long as she did not appear, the State "ain't got shit." Breland moved to Oklahoma and, although she initially spoke to Hargrove, she terminated communication with him and stopped answering or returning his phone calls and emails.

Having reviewed the evidence presented at the hearing on the State's motion for finding of forfeiture by wrongdoing, we conclude the trial court did not abuse its discretion by concluding the State showed by a preponderance of the evidence that appellant wrongfully procured Breland's unavailability at trial. Accordingly, the trial court did not abuse its discretion by admitting Breland's out of court statements. We overrule appellant's second issue.

### C. Conclusion

We affirm the trial court's judgment.

/Erin A. Nowell//  
ERIN A. NOWELL  
JUSTICE

200968f.u05  
Do Not Publish  
Tex. R. App. P. 47.2(b)

# S

## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

JOSE DOMINGUEZ, Appellant

No. 05-20-00968-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 86th Judicial District Court, Kaufman County, Texas
Trial Court Cause No. 19-10909-86-F.
Opinion delivered by Justice Nowell. Justices Partida-Kipness and Pedersen, III participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 29th day of July, 2022.