**AFFIRMED and Opinion Filed August 1, 2023**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-19-01561-CR**

**THOMAS GEORGE GRISWOLD, III, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 382nd Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 2-19-0884**

# OPINION ON REMAND

Before Justices Molberg, Goldstein, and Smith
Opinion by Justice Goldstein

On the Court's own motion, we withdraw our opinion issued June 13, 2023

and vacate our judgment of that date. The following is now the opinion of the Court.

Thomas George Griswold, III appeals his conviction for the third-degree

felony offense of stalking. A jury convicted Griswold and sentenced him to ten

years' confinement. In three issues, Griswold asserts (1) the evidence is legally

insufficient to support his conviction, (2) the trial court abused its discretion by

denying his motion for new trial without conducting an evidentiary hearing, and (3)

the trial court erred by denying his motion to quash the indictment because the stalking statute is unconstitutionally overbroad and vague on its face.

On original submission, this Court determined that the stalking statute, section 42.072(a) of the penal code, was unconstitutionally overbroad and vague on its face to the extent it incorporated section 42.07(a)(7) and included the terms "harass, annoy, alarm, abuse, torment, embarrass, or offend"; reversed the trial court's judgment; and remanded to the trial court to dismiss the indictment.

The Texas Court of Criminal Appeals vacated this Court's judgment and remanded this case for further consideration in light of its opinions in *Ex parte Barton*, 662 S.W.3d 876 (Tex. Crim. App. 2022), *cert denied*, 143 S. Ct. 774 (2023), and *Ex parte Sanders*, 663 S.W.3d 197 (Tex. Crim. App. 2022), in which the court of criminal appeals upheld the facial constitutionality of a previous version of section 42.07(a)(7). *See* Acts 2001, 77th Leg., ch. 1222 (S.B. 139), § 1, eff. Sept. 1, 2001.[1] The Texas Court of Criminal Appeals recognized that "[t]he indictment in this case alleged conduct that occurred on or about January 1, 2007 through April 24, 2018" and "[t]herefore, at least a portion of Appellant's case  involves a challenge to the version of section 42.07 that became effective after being amended by the legislature in 2017." *Griswold v. State*, 664 S.W.3d 864, 864–65 Tex. Crim. App. 2022) (per

---

[1] *See also State v Chen*, No. PD-0096-21, 2022 WL 3641038, (Tex. Crim. App. Aug. 24, 2022) (per curiam), *withdrawn and superseded on reh'g by,Ex parte Chen*, 665 S.W.3d 448 (Tex. Crim. App. 2022), *cert. dism'd*, 143 S. Ct. 649 (2023).

curiam) (citing Acts 2017, 85th Leg., ch. 522 (S.B. 179), §§ 13, 14, eff. Sept. 1, 2017).[2]

## BACKGROUND

Griswold was indicted for stalking under section 42.072 of the penal code for conduct beginning on or about January 1, 2007, and ending on April 24, 2018. Specifically, the indictment alleged that Griswold:

> did then and there on more than one occasion and pursuant to the same scheme or course of conduct directed specifically toward [the complainant] that [Griswold] knowingly engaged in conduct that constituted an offence under section 42.07 and/or conduct that [Griswold] knew or reasonably should have known [the complainant] would regard as threatening bodily injury for [the complainant] and or bodily injury or death, and did cause [the complainant] to be placed in fear of bodily injury or death, to-wit:
>
> The Defendant repeatedly communicated with [the complainant] that God had made the two of them one flesh, that she was his wife, and made repeated requests for sexual contact with [the complainant];
>
> The Defendant repeatedly made public declarations on Facebook that God had made the two of them one flesh, that [the complainant] was his wife, and made repeated requests for sexual contact with [the complainant];

---

[2] We note that Section 42.07 was amended three times during the time frames relevant here. Acts 2001, 77th Leg., ch. 1222 (S.B. 139), § 1, eff. Sept. 1, 2001; Acts 2013, 83rd Leg., ch. 1278 (H.B. 1606), § 1, eff. Sept. 1, 2013; Acts 2017, 85th Leg., ch. 522 (S.B. 179), §§ 13, 14, eff. Sept. 1, 2017. For purposes of our opinion on remand, the amendments do not require additional analysis of the terms "harass, annoy, alarm, abuse, torment, embarrass, or offend." Barton was charged with harassment, alleged offenses that occurred in 2012, under the definition of "electronic communication" analyzed under the 2001 version, noting the current version is at Texas Penal Code section 42.07(a)(1). *Sanders* was governed by the 2013 version of the electronic harassment statute. The definition of electronic communication was expanded relative to the method or medium of transmission in 2017, and the 2013 amendments principally amended the stalking statute to incorporate the offense of harassment. The 2001 version defined electronic communication as "a communication initiated by electronic mail, instant message, network call or facsimile machine" and "to a pager." *Barton*, 662 S.W.3d at 878 n.1, 2; s*ee also Sanders*, 663 S.W.3d at 201 n.1, 2. Here, the expansive modes of the transmission raised in Presiding Judge Keller's dissent are directly at issue, as the indictment asserts five specific allegations of repeated communications, public declarations on Facebook, public statements, and public threats. The majority opinions in *Barton* and *Sanders* focus on the non-speech conduct, the act of sending the communication, rather than, or irrespective of, the mode of transmission.

The Defendant repeatedly made public statements about Gamma-Hydroxybutyrate, a common date rape drug;

The Defendant made public statements that he needed "to kill people over" [the complainant];

The Defendant made public threats involving killing people, specifically anyone that touches [the complainant] and direct threats to the complainant's] boyfriend[.]

The indictment continued by alleging Griswold's conduct caused the complainant "to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended" and "would cause a reasonable person to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended."

At the time Griswold was indicted, section 42.072 of the penal code, entitled "Stalking," provided:

(a) A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:

(1) constitutes an offense under Section 42.07, or that the actor knows or reasonably should know the other person will regard as threatening:
(A) bodily injury or death for the other person;
(B) bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or
(C) that an offense will be committed against the other person's property;
(2) causes the other person . . . to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and
(3) would cause a reasonable person to:
. . .
(D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

TEX. PENAL CODE ANN. § 42.072(a). Section 42.07, the "electronic-communications-harassment statute," provided:

> (a) A person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person:
> . . . .
>
> (7) sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another.

*Id.* § 42.07(a)(7). Also, at the time of the indictment, the definition of electronic communication encompassed current forms of communication and means:

> a transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system. The term includes:
> (A) a communication initiated through the use of electronic mail, instant message, network call, a cellular or other type of telephone, a computer, a camera, text message, a social media platform or application, an Internet website, any other Internet-based communication tool, or facsimile machine; and
> (B) a communication made to a pager.

*Id.* § 42.07(b)(1).

Prior to trial, Griswold filed a motion to quash the indictment relying upon *Ex parte Barton*, 586 S.W.3d 573, 583–85 (Tex. App.—Fort Worth 2019) (op. on reh'g), *rev'd and remanded*, 662 S.W.3d 876 (Tex. Crim. App. 2022), and alleging the stalking statute was unconstitutionally vague and overbroad, to the extent it incorporated the harassment statute, section 42.07(a)(7), and included the terms

harass, annoy, alarm, abuse, torment, embarrass, or offend. After a hearing, the trial court denied the motion and proceeded to trial.

C.F., the complainant, testified that, after graduating from Rockwall High School with Griswold in 2006, Griswold began a pattern of frequent text, voicemail, email, and social media messaging to her. C.F. had never kissed or dated Griswold and had not "been intimate in any way whatsoever" with Griswold. There was "not initially" anything troubling with Griswold's communications, and C.F. "was trying to just be nice to him." However, within a few months, the frequency of the contact started to scare C.F. C.F. changed her summer 2006 plans to be a church camp counselor because she found out Griswold signed on to attend. In spring of 2007, Griswold's letters began stating that Griswold was a prophet, and God was telling him that C.F. was meant to be his wife. C.F. never spoke with Griswold after June 2007.

In fall 2007, Griswold transferred to West Point. Griswold told C.F. he would kill for her, which scared C.F. because Griswold was at West Point "training to be able to use weapons." In one letter, Griswold told C.F., "Please don't be afraid of me," apologized for "the stress this has caused" C.F., and wrote that he was "begging" C.F. "please don't get me in trouble for this." In November 2007, C.F.'s father (Father) flew to West Point with Griswold's father and left with the understanding that Griswold's commanding officer would order Griswold to end

–6–

communication with C.F. However, Griswold did not stop communicating with C.F. Griswold also ignored a cease and desist letter from an attorney.

At the end of 2007, Griswold resigned from West Point, and "things did go quiet for a little while." Griswold began contacting C.F. again when she started dating B.D., the man she eventually married. C.F. made her social media private, but Griswold used "different Facebook profiles" to get in. As a result, C.F. and her friends all had to continually block Griswold's different accounts to prevent Griswold from obtaining information about what C.F. was doing. At that time, C.F. was scared that Griswold would "do whatever he needs to to actually physically get to" her, but C.F.'s "bigger fear" was that Griswold "would hurt someone [C.F.] loved to get to" her. C.F. also feared that Griswold might sexually assault her.

C.F. knew Griswold had dabbled in drugs in high school and college, and Griswold told her he was high on LSD when he "baptized himself in his parents' pool" and "Jesus came down and told him that [C.F.] was his wife." In 2015 and 2016, C.F. became more frightened when Griswold mentioned "injecting methamphetamine." As a medical professional, C.F. knew that particular drug "makes you more reckless." On Facebook, Griswold posted "open discussions" about the date rape drug GHB. When Father again attempted to intervene to stop Griswold, Griswold directed some of his anger toward Father, saying Father was "keeping [C.F.] from him." On March 2, 2016, Griswold sent a message saying "Burn [C.F.] with unquenchable fire for the literal expanse of eternity if I do not get

–7–

to be with my wife ([C.F.]) in the next three months." This "time limit" scared C.F. "a lot more" because it indicated that Griswold had "some kind of a plan in place" and "there might be something harmful at the end of that for [C.F.] or [her] family" if Griswold did not get what he wanted.

In March 2016, Father met with Detective Burks of the Rockwall Police Department. Burks filed harassment charges against Griswold, who lived in Rockwall County. Griswold pled guilty to harassment based upon his conduct that was directed towards Father, did not claim insanity, and was placed on probation on February 16, 2017, for 24 months. Griswold violated his probation by drinking alcohol and contacting C.F. through Facebook six times.

After C.F.'s divorce from B.D. was finalized in 2018, Griswold's communications toward her became more focused on sex. In a series of posts on Facebook, Griswold wrote about C.F.'s living as his "sex slave" and said he would not "overly stalk you babies if you'll still be my friend." Griswold also sent C.F. "video after video" directly. C.F. immediately turned off her social media.

The jury convicted Griswold of stalking as charged in the indictment and sentenced him to ten years in prison. He then filed a motion for new trial, which the trial court denied. This appeal followed.

## DISCUSSION

### A. Third Issue on Remand

We first address Griswold's third issue, in which he challenges the constitutionality of the stalking statute.[3]  In particular, he contends the harassment statute, which is incorporated by direct reference into the stalking statute, is unconstitutionally vague and overbroad because the words "harass, annoy, alarm, abuse, torment, or embarrass" "leave[] the electronic-communications subsection open to various 'uncertainties of meaning.'"  In two recent opinions, the Texas Court of Criminal Appeals disagreed.

In *Barton*, the appellant was charged with violating penal code section 42.07(a)(7).  *Ex parte Barton*, 586 S.W.3d at 575.  Appellant filed a motion to quash the information, arguing that the statute was unconstitutional and that the information failed to provide adequate notice because it lacked specificity.  *Id.* at 576.  The motion was denied after a hearing.  *Id.*  Appellant then filed a pre-trial application for habeas corpus relief, again raising the constitutionality of the statute. *Id.*  The trial court denied relief, but the court of appeals held section 42.07(a)(7) unconstitutional and reversed.  *Id.* at 585.  The court of criminal appeals determined that, for First Amendment purposes, the conduct regulated by section 42.07(a)(7) is non-speech conduct that does not implicate the First Amendment.  *Barton*, 662

    [3] Griswold's Motion to Quash the Indictment was based solely on the provisions of the stalking statute that incorporate the harassment statute.  To the extent Griswold seeks to challenge the constitutionality of the stalking statute on another basis on appeal, the constitutional challenge was not presented to the trial court and therefore is not preserved for our review.  *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) (holding appellant may not raise facial challenge to constitutionality of statute for first time on appeal).  Even if error had been preserved, this Court has upheld the facial constitutionality of the stalking statute.  *Taherzadeh v State*, 648 S.W.3d 681 (Tex. App.—Dallas 2022, no pet.); s*ee also State v. Seibert*, 156 S.W.3d 32 (Tex. App.—Dallas 2004, no pet.).

S.W.3d at 885. The court of criminal appeals held that section 42.07(a)(7), the electronic harassment statute, is not facially unconstitutional. *Id.* The court reversed the judgment of the court of appeals and remanded for further proceedings. *Id.*

In *Sanders*, the appellant was also charged with violating penal code section 42.07(a)(7). 663 S.W.3d at 201. The court held that, on its face, section 42.07(a)(7), the electronic harassment statute, proscribes non-speech conduct that does not implicate the protections of the First Amendment, although elements of speech may be employed to commit the offense. *Id.* at 216.

In light of these authorities, we are constrained to reject Griswold's facial constitutional challenge to the stalking statute insofar as it incorporates the harassment statute. *See Barton*, 662 S.W.3d at 885; *Sanders*, 663 S.W.3d at 216. We overrule Griswold's third issue.[4]

## B. First Issue: Legal Sufficiency

In his first issue, Griswold argues the evidence is legally insufficient to support his conviction. Specifically, Griswold complains that, while the evidence was sufficient for the jury to reject his defense of insanity, the evidence was

---

[4] Griswold does not challenge the constitutionality of the statute as applied to the allegations in the indictment nor does he seek First Amendment protections of the alleged content-based conduct. While *Barton* and *Sanders* rely on non-communicative based conduct to support the facial constitutionality of the harassment statute and, for our purposes, the stalking statute, we are not presented with an opportunity for an as-applied analysis, and we are therefore precluded from doing so. "The question of whether the statute is vague will have to wait for a proper as-applied challenge." *Barton*, 662 S.W.3d at 885. Further, while this case illustrates the inability to divorce content from conduct in the harassment context, as incorporated into the stalking statute, we are also not presented with an opportunity to conduct an overbreadth analysis under the First Amendment as there is no contention that Griswold's communications were protected speech, either at the trial court or on appeal. *See id.* at 886–87 (Keller, P.J., dissenting).

nevertheless insufficient to establish that he acted knowingly when he committed the alleged offenses.

We apply well-known standards when reviewing challenges to the legal sufficiency of the evidence. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We view all of the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 239–40 (Tex. Crim. App. 1997). The hypothetically correct jury charge sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* at 240.

We must give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Villa*, 514 S.W.3d at 232. Our role is only to ensure that the jury reached a rational conclusion, not to re-evaluate the weight and credibility of the evidence. *See Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

Circumstantial evidence is as probative as direct evidence in establishing the accused's guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See id*. Juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Id*. at 15. Juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id.* An inference is a conclusion reached by considering other facts and deducing a logical consequence from them, while speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* at 16.

Griswold first concedes that the evidence is sufficient to establish that he could not rely on his insanity defense. However, Griswold asserts that the evidence is insufficient to show he had the required mental state when he committed the alleged bad acts. Specifically, Griswold repeatedly argues there is no evidence that he knew when he sent a message that the message "constituted an offense under 42.07" or that it would be interpreted as a threat of bodily injury or death to C.F., a member of her family, or a person with whom she was in a dating relationship. In making this argument, Griswold cites the testimony of the State's expert, Dr. Mitchell Dunn, that mentally ill people like Griswold may know that an act is criminal even when they do not "necessarily believe they were wrong."

–12–

Here, as limited by the indictment and a hypothetically correct jury charge, the State had to prove that Griswold: (1) on more than one occasion; (2) pursuant to the same scheme or course of conduct directed specifically toward C.F.; (3) knowingly engaged in conduct that constituted an offense under section 42.07 and/or conduct that Griswold knew *or reasonably should have known* that C.F. would regard as threatening bodily injury or death for C.F.; (4) did cause C.F. to be placed in fear of bodily injury or death; and (5) would cause a reasonable person to fear bodily injury or death for herself. *See* TEX. PENAL CODE ANN. § 42.072(a) (emphasis added). The indictment listed five specific allegations of repeated communications, public declarations on Facebook, public statements, and public threats. Thus, even if Griswold did not "know" that his decade-long barrage of letters, messages, and contacts constituted an offense under section 42.07 or would cause C.F. to be placed in fear of bodily injury or death, that does not end our inquiry. The question before us is whether the evidence is legally sufficient to establish that Griswold reasonably should have known that his behavior would have such an effect. *See id.*

Griswold was charged with stalking over a decade-long period of time. The undisputed evidence showed, among other things, that Griswold repeatedly sent emails, letters, cds, and text messages during that time frame. The jury could rationally have believed that these actions constituted a course of conduct, occurring on more than one occasion, that was directed specifically at C.F. There was evidence

from which the jury could have rationally concluded that C.F exhibited behavior objectively demonstrating fear of Griswold's conduct.

Critically, there is evidence from which the jury could have rationally concluded that Griswold knew or reasonably should have known that C.F. would regard his behavior as threatening bodily injury or death for C.F. and/or bodily injury or death to her family. Among the communications attributed to, or known by, Griswold, and before the jury, were the following:

- Facebook message to C.F. and two others: "Can I get your current phone numbers or get you to unblock Me on your current phone numbers?

- A Facebook message stating "I have a real Facebook Account you all have blocked. I won't overly stalk you . . . . I'll never be sane again if I don't get to have sex with C.F. . . . ."

- Numerous text messages where Griswold refers to C.F. as his wife and he her husband, they are of "one flesh"

- "God made [C.F.] and I one flesh in 2007"

- "In 2007, God told Me to pursue her [C.F.] as I would wisdom… and 'the two became one flesh'"

- In an email to C.F. in August of 2007: "I am going to kill people for a living, I would kill any man that would touch you (if we happen like I think we do). I would kill any one that would touch our children (if that ever happened) I am not afraid of any thing [C.F.]. There is nothing I fear."

- In an October 11, 2007 text to C.F. Griswold stated "your fear is unjust."

- Undated handwritten letter that states "Please don't be afraid of me."

- A December 20, 2007 Criminal Trespass Letter was sent to Griswold putting him on notice that he is not welcome at identified properties where CF or her family reside, along with notification of the offense of Criminal Trespass.

–14–

- A Judgment and Order Granting Deferred Adjudication after having pled guilty to the offense of Harassment signed February 16, 2017, that included a condition that Griswold "will have no contact, direct or indirect," with C.F.'s Father, or his family members, including C.F.

- In April 2018, Griswold posted Facebook messages relative to his "need to have sex" with C.F.

- Undated statements in Facebook postings by Griswold:

  - "I'm meant to love a woman and when the army officers, the policemen, the angry fathers, my parents and the medical professionals tell me to stop . . . I don't. Not because it is hard for me to do. But because I can't not."

  - "Do you realize the girl's Fathers are ready to prosecute you? Look . . . calm down . . . I hit on your daughter… this is my third manic episode . . . just ignore the raucous and kindly let me manifest my messiah complex . . . ."

  - "[S]orry to embarrass you [C.F] . . . ."

  - "I need to kill people over [C.F.] to feel okay and I never will so I'll never feel okay so just kill me. Anybody. Please."

  - "Who is [B.D.] where did he take her why did he take her from Tommy Griswold . . . . I parade around everything that knows I'm the Truth if you try to take her from me I will kill everything I ever knew could ever exist that could take her from me."

Thus, the record shows Griswold was subjected to repeated interventions attempting to get him to cease and desist contacting C.F., including a court order to have no direct or indirect contact with C.F.; nevertheless, Griswold's public statements and contact with C.F. increased in frequency and escalated in sexually explicit content and threats of harm. Given the evidence and the record, the jury rationally could

have concluded that Griswold knew or reasonably should have known that his constant messaging would be regarded by C.F. as threatening bodily injury or death for C.F. and did cause C.F. to be placed in fear of bodily injury or death. On the record before us, we determine a rational trier of fact could have found the essential elements of the offense as set out in the hypothetically correct charge for stalking beyond a reasonable doubt. *See Villa*, 514 S.W.3d at 232; *Malik*, 953 S.W.2d at 239–40. We overrule Griswold's first issue.

**C. Second Issue: Motion for New Trial**

In his second issue, Griswold complains that the trial court erred in denying his motion for new trial without conducting an evidentiary hearing. The purpose of a hearing on a motion for new trial is to: (1) decide whether the cause shall be retried and (2) prepare a record for presenting issues on appeal in the event the motion is denied. *Smith v. State*, 286 S.W.3d 333, 338 (Tex. Crim. App. 2009). Such a hearing is not an absolute right. *Id.* A hearing is not required when the matters raised in the motion for new trial are subject to being determined from the record. *Id.* Conversely, a trial judge abuses his discretion in failing to hold a hearing on a motion for new trial when that motion raises matters which are not determinable from the record. *Id.* To hold otherwise would deny the accused meaningful appellate review. *Id.*

Recognizing that an unrestricted requirement of a hearing on matters not determinable from the record could lead to "fishing expeditions," the court of

criminal appeals has also held that even a defendant who has raised such matters is not entitled to a hearing on his motion for new trial unless he establishes the existence of reasonable grounds showing that he could be entitled to relief. *Id.* at 339. Thus, as a prerequisite to a hearing when the grounds in the motion are based on matters not already in the record, the motion must be supported by an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim. *Id.* The affidavit need not establish a prima facie case, or even reflect every component legally required to establish relief. *Id.* It is sufficient if a fair reading of it gives rise to reasonable grounds in support of the claim. *Id.* But affidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, in that circumstance, no hearing is required. *Id.*

When examining a trial court's denial of a hearing on a motion for new trial, we review for an abuse of discretion. *Id.* In so doing, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.* And in the absence of such an abuse of discretion this Court would not be justified in reversing the judgment. *Id.* at 340. Our review, however, is limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable, meaning they could entitle the defendant to relief. *Id.* This is because the trial judge's discretion extends only to deciding whether these two requirements

are satisfied. *Id.* If the trial judge finds that the defendant has met the criteria, he has no discretion to withhold a hearing. *Id.* In fact, under such circumstances the trial judge abuses his discretion in failing to hold a hearing. *Id.*

The record here shows that, during voir dire, the prosecutor projected an image of Charles Manson on a screen for the jury to see. The prosecutor made the point that Manson was "absolutely insane" but still criminally responsible for his conduct and also mentioned John Hinckley and other famous defendants who claimed insanity as a defense before stating the standard in Texas to find insanity. Griswold made no objection. On December 19, 2019, Griswold filed a motion for new trial in which he alleged that the prosecutor, when showing the picture of Charles Manson, sent an "unstated or non-verbal message" to the jurors that Griswold is comparable to Manson "in a way that is harmful." The motion was supported by the declaration of Griswold's mother who stated: (1) during jury selection, the attorney for the State projected an image of Charles Manson onto a screen for the jury to see and (2) as a spectator, she thought her son was being compared to Charles Manson.

Griswold did not object during voir dire when the State showed an image of Charles Manson to the jury in the context of a discussion about insanity. The trial in this case concluded on November 20, 2019, and Griswold filed his motion for new trial on December 19, 2019. A defendant may not raise a matter for the first time in a motion for new trial if he had the opportunity to raise it at trial. *Colone v.*

–18–

*State*, 573 S.W.3d 249, 260 (Tex. Crim. App. 2019); *see* TEX. R. APP. P. 33.1 (complaint must be "timely"). We conclude that, by failing to object or otherwise challenge the State's use of Charles Manson's image, Griswold could not raise the issue for the first time in a motion for new trial. *See Colone*, 573 S.W.3d at 260. Accordingly, the trial court did not abuse its discretion in refusing to hold the requested evidentiary hearing or in denying Griswold's motion for new trial. *See Smith*, 286 S.W.3d at 339. We overrule Griswold's second issue.

We affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Publish
TEX. R. APP. P. 47.2(b)

191561F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THOMAS GEORGE GRISWOLD, III, Appellant

No. 05-19-01561-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 382nd Judicial District Court, Rockwall County, Texas

Trial Court Cause No. 2-19-0884. Opinion delivered by Justice Goldstein. Justices Molberg and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered August 1, 2023