**AFFIRMED and Opinion Filed August 21, 2024**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-00790-CR

## RONALD ANTHONY ELLIOTT, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F20-76874-T**

## MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Goldstein
Opinion by Justice Goldstein

Ronald Anthony Elliott appeals his murder conviction. A jury convicted appellant and sentenced him to sixty years' confinement. In six issues, appellant argues the State failed to disprove that he acted in self-defense, the trial court erred by failing to limit the culpable mental state in the jury charge and not submitting a jury charge on apparent danger, he was harmed by cumulative error in the jury charge, and the trial court abused its discretion in not allowing him to question a detective about appellant's statements to police and not allowing appellant to testify about his statements to police. We affirm the trial court's judgment.

# BACKGROUND

In December 2020, appellant was charged by indictment with murder. Specifically, the indictment alleged that, on or about November 1, 2020, appellant (1) intentionally and knowingly caused the death of Patrick Richardson by shooting him with a firearm and (2) further intended to cause serious bodily injury to Richardson and committed an act clearly dangerous to human life by shooting Richardson with a firearm, a deadly weapon, and thereby caused the death of Richardson.[1]

At trial in July 2022, the State called nine witnesses in its case in chief, and appellant testified as the defense's only witness during the guilt innocence phase of the trial.

## 1. Eye Witness: Derrick McWilliams

Derrick McWilliams testified that he owns Huge Guyz Kitchen, a restaurant in Dallas. McWilliams was "mostly in the back" of the restaurant, and he had two women, Jasmine Rogers and Markeidria Alberty, working "out front." On November 1, 2020, the restaurant did not open until approximately 1:30 p.m. even though it normally opened at noon. People were waiting in line outside the restaurant before it opened. Alberty was "making the plates" and McWilliams was "taking the money and bagging up the food."

---

[1] The indictment thus charged appellant with murder under both alternatives provided by section 19.02(b) of the penal code. *See* TEX. PENAL CODE § 19.02(b)(1)–(2).

"A guy walked in." McWilliams heard somebody say "What you . . . lookin at?" McWilliams said, "Not up in here," and did not pay any more attention until he had finished "bagging up, like, two or three more customers" and saw "that he got surrounded." McWilliams "came from behind the counter, and that's when the shooting started." McWilliams saw "a guy with dreads start shooting," and then McWilliams "fell back and everybody started running out." McWilliams identified appellant as the "guy with dreads." McWilliams' restaurant had video cameras capable of recording, and the State played a video of events on the day of the shooting while McWilliams testified as to what was depicted. The video showed appellant, Alton Keaton, William Davis, Madarius Counter, and another man enter the restaurant. About fifteen minutes later, the decedent, Richardson, entered the restaurant. McWilliams testified and, after watching the video from inside the restaurant, confirmed appellant shooting and established that he did not see Richardson "grab a gun or pull a gun or have anything in his hands at all."[2] Shortly thereafter, appellant ran out of the restaurant, and his companions followed. Richardson also came out of the restaurant and fell down.

## 2. Eyewitness: Markeidria Alberty

Alberty testified she knew Richardson since she was fifteen years old, and Richardson was friends with her "baby daddy," McKendrick Taylor. Alberty did

---

[2] On cross-examination, McWilliams confirmed that he "he didn't see Mr. Richardson with a gun" but also stated that he didn't "know whether he had a gun or not."

not have "a personal relationship" with appellant, but she knew him by his nickname, "Pickles." On November 1, 2020, the restaurant was "pretty hectic," and customers were waiting in line for food. Richardson walked in to the restaurant "with a smile on his face saying he was ready to eat," talking to Alberty from a distance. The customers in the restaurant were "making small talk" while they waited on the food, but it "started to be, like, a loud commotion." When McWilliams said "not in here," Richardson put his hands up and said, "I don't want no smoke, Big Homie. I don't want no problem. I just want to get my plate." Appellant "reached, like, somewhere from the side and he got a gun and he started shooting repeatedly" at Richardson and appellant's friends.

In response to step-by-step questioning in conjunction with the playing of a video by the prosecutor, Alberty testified Richardson kept his hands on his belly and not to his sides. When asked whether Richardson said "Pull yours before I pull mine," Alberty testified "He didn't have one to pull." Richardson's "body started to move" toward the door, and appellant's hand "went from being on his side now to up a little bit." Richardson was "clearly trying to get towards the door," and appellant started shooting while Richardson was trying "to run out the door." Once Richardson was no longer in the restaurant, appellant continued to shoot at Richardson as Richardson was running away. When Richardson fell down outside, appellant was "still chasing him."

When the shooting started, Alberty initially ducked down but then got up and ran out the back door. Alberty walked to the side of the building to see what was going on, and she saw Richardson alone on the ground. Alberty ran over to Richardson, who had his cell phone and keys in his hand. Richardson gave Alberty "his stuff" and told Alberty to lock his car door. Richardson tried to get up but went into shock, "started foaming at the mouth and then it was done." Alberty waited for the ambulance and police to arrive, drove Richardson's car to the hospital and gave the car to Richardson's friends.

While Alberty was driving away in Richardson's car, appellant called Alberty on Facebook messenger and asked "if there were cameras inside" the restaurant. Alberty said there were cameras, and appellant said he was going to turn himself in. Appellant sounded "paranoid" during the call.

3. **Appellant's testimony**

Appellant testified that, on November 1, 2020, Richardson was out on bond for the murder of Brandon Fisher, a friend of appellant's. Appellant "knew" Richardson was a drug dealer who was "known to carry weapons." During an incident at a strip club in 2018, Richardson confronted Fisher "about some theft or robbery at one of his houses." Richardson said to Fisher, "Make your move before I make mine." When Richardson left the club, appellant was "concerned" for Fisher, but Fisher declined appellant's offer to walk to the car with him. After Fisher left the club with his girlfriend, "they yelled on the loudspeaker, 'Pickle, [Richardson]

–5–

just shot your friend in the head.'"  Appellant went outside and saw Fisher lying on the ground with a gunshot wound to the head.

Before November 1, 2020, appellant had never seen Richardson at Huge Guyz Kitchen, but appellant had come into contact with Richardson "three or four times." Richardson had called appellant and others "snitches" because they were going to testify about Richardson murdering Fisher.

On the day of the shooting, appellant had a gun "for protection" because he had been "robbed, like, a week before."  When appellant arrived at Huge Guyz Kitchen, Richardson was not there. Appellant testified he and his companions were not engaged in any criminal activity, were not gambling, and were "[j]ust there to eat."  About thirty minutes after appellant arrived at the restaurant, Richardson arrived and yelled, "What you . . .  lookin at?" at Counter, one of appellant's companions.  Counter went back to where Richardson was, and the two began arguing.  Things "escalate[d]," and Richardson said, "Go for your move before I go mine." Counter looked back at appellant "like he was scared," and appellant "pulled mine" before Richardson could "pull his" and "started shooting first."  Appellant testified he believed Richardson had a weapon and was "fixing to pull something." Appellant, when asked "[o]r is he grabbing here (indicating) like he has a weapon?" responded "Like he has a weapon" and confirmed he had "seen that" "[l]ike three times" on the video.  Appellant was concerned he would kill them like he killed [Fisher].  Appellant saw "the print" through Richardson's T-shirt, which appellant

–6–

clarified was the shape of a gun. While appellant was shooting at Richardson, appellant "felt" that Richardson was "[t]rying to reposition to get his gun" even though he was running away and was "[r]unning to reposition." Appellant "didn't even know he hit" Richardson, and appellant "just was shooting" with all the people around and "shooting towards several of [his] friends." Appellant fired his gun "10 times, 12 times" and hit Richardson eight times: five times in the back, two times in the side, and once in the shoulder. When appellant saw Richardson running toward a car lot next door, appellant testified Richardson was "still breathing" and "could have turned around and started shooting." In response to questioning, appellant testified that, when Richardson fell and was "on the ground dying," appellant was "running away" because he did not know if anyone else was coming to help Richardson.

Appellant denied calling Alberty and testified he called a detective after he "had [his] uncle drive to the scene and get the card" with the detective's number on it. Appellant told the detective he was willing to give his statement and turn himself in. On cross-examination, appellant admitted he shot and killed Richardson and "committed an act clearly dangerous to human life by shooting [Richardson] and murdering him that day." At the conclusion of the evidence, the jury convicted appellant of murder. This appeal followed.

## DISCUSSION

### A. First Issue:  Legal Sufficiency

In his first issue, appellant argues the evidence is legally insufficient to support his murder conviction "in that the State failed to disprove appellant's justification of self-defense."

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.).

The factfinder is the sole judge of witness credibility and the weight to be given testimony.  *See Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder.  *Bohannan v. State*, 546 S.W.3d 166, 178 (Tex. Crim. App. 2017).  "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination."  *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015).

We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge.  *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  This standard recognizes the trier of fact as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the

evidence, and on review, we determine whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all of the evidence. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

When it comes to sufficiency review of a self-defense claim, the court of criminal appeals has stated the following:

> [I]n a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). By contrast, the State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913). Thus, "[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914.

*Braughton v. State*, 569 S.W.3d 592, 608–09 (Tex. Crim. App. 2018).

A person commits murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1)–(2). However, it is a defense to prosecution that the conduct in question is justified under Chapter 9 of the penal code. *Id.* § 9.02. A person is

justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id.* § 9.31(a). A person is justified in using deadly force against another if the actor would be justified in using force against the other under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a).

Appellant does not challenge the sufficiency of the evidence to show he shot and killed Richardson; instead, he challenges the sufficiency of the evidence to disprove his justification of self-defense. In making this challenge, appellant assumes he has met his initial burden to adduce some evidence that would support a rational finding in his favor on the defensive issue. Appellant relies on several different evidentiary bases to support his assertions under this issue. First, appellant knew that Richardson "was violent, carried a weapon and was a cold-blooded killer" out on bond for the murder of Fisher. Second, when Richardson walked into the restaurant, he engaged appellant and his companions "and was the aggressor," yelling "What you . . . lookin at?" at one of appellant's companions and remaining in the restaurant even though he could have left. Third, appellant saw "the print" through Richardson's T-shirt, which appellant clarified was the shape of a gun, and Richardson said, "Go for your move before I go mine." Fourth, appellant ran away after the shooting because he did not know if anyone else was coming to help

–10–

Richardson. Finally, appellant turned himself in voluntarily and gave a statement to police. Appellant argues that this evidence corroborates his "testimony that Richardson had a firearm and was reaching for it that day and that [appellant] acted in self-defense and in defense of others."

Appellant's testimony is juxtaposed against other testimony and evidence considered by the jury. McWilliams testified and video from inside the restaurant showed that appellant was shooting and that Richardson did not "grab a gun or pull a gun or have anything in his hands at all." Alberty testified Richardson did not have a gun to "pull." Other than appellant's testimony that he saw "the print," there was no evidence Richardson had a gun. Instead, the evidence showed Richardson was not threatening appellant with a weapon but, according to Alberty, was "clearly trying to get towards the door," and appellant started shooting while Richardson was trying "to run out the door." No gun linked to Richardson was recovered from the scene of the shooting.

Appellant argues further that Alberty was "not a credible witness" because she was on probation for theft and had "about five different thefts." Citing to the fact that Alberty "tampered with evidence at the scene" by taking Richardson's property and car, appellant posits that Alberty or someone else that day took Richardson's firearm." Justin O'Donnell, a Dallas police crime scene supervisor, testified he recovered 9mm fired cartridge casings at the scene but also found a single .40 caliber Smith & Wesson fired cartridge casing from the crime scene, but he could

–11–

not tell how long it had been there or how far away it was "from the white vehicle where the bloodstains were found." Nevertheless, appellant cites O'Donnell's testimony that it was "possible" there were two firearms at the scene, presumably in support of appellant's argument that the evidence showed Richardson had a gun. Kialani Killinger, a trace evidence examiner at the Southwest Institute of Forensic Sciences (SWIFS), testified she conducted an analysis of gunshot residue on Richardson and recovered "one particle characteristic of primer gunshot residue confirmed" on the back of Richardson's left hand. Killinger testified it was possible the gunshot residue indicated Richardson had handled or fired a firearm. Appellant argues this testimony supports his own testimony that Richardson had a firearm. However, Killinger also testified there was no way to tell if Richardson fired a weapon, and there were different ways to get gunshot residue on your hands, including "being nearby while you're being shot" or "clutching your wound where you got shot." As with the other evidence admitted at trial, the jury was the sole judge of the weight and credibility of the evidence. *See Adames*, 353 S.W.3d at 860.

Here, "viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Braughton*, 569 S.W.3d at 608–09 (quoting *Saxton*, 804 S.W.2d at 914). Accordingly, we conclude the evidence is legally sufficient to support appellant's murder conviction and the jury's rejection

–12–

of appellant' claim that he acted in self-defense.  *See id.*  We overrule appellant's first issue.

### B.  Second and Third Issues: Jury Charge Error, Culpable Mental State and Apparent Danger

In his second issue, appellant complains the trial court erred in not limiting the culpable mental state of "knowingly" and "with knowledge" to the result of appellant's conduct.  In his third issue, appellant argues the trial court erred by not submitting a jury charge on apparent danger, thereby limiting the jury's consideration to only actual danger.  In his fourth issue, appellant asserts he was harmed by the cumulative jury charge error.  Because appellant argues these issues together, we address these issues together.

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015).  If error exists, we must determine whether the error caused sufficient harm to warrant reversal.  *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App .2005).  When, as in this case, the error was not objected to, the error must be "fundamental" and requires reversal only if it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).  Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error.  *Nava v. State*,

415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 174. Egregious harm consists of error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defensive theory. *Villarreal*, 453 S.W.3d at 433. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). We assess harm in light of (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) if applicable any other relevant information revealed by the trial record as a whole. *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022).

Appellant argues that murder is a result-of-conduct offense, which means that the applicable mental state is only that related to result of conduct, citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). Appellant points out that the trial court's definition of "intentionally" was limited to the result of conduct, but the definition of "knowingly" or "with knowledge" was not limited to the result of conduct. As a result, appellant argues he was egregiously harmed because the jury was allowed to convict appellant "based not upon [a]ppellant's intent to cause Richardson's death or serious bodily injury but instead upon the nature of conduct and/or circumstances surrounding the conduct and not the required culpability to effect the result."

The jury charge in this case instructed the jury that a person commits the offense of murder if the person (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. The trial court further instructed the jury that:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

"Section 6.03 of the Texas Penal Code sets out: four culpable mental states— intentionally, knowingly, recklessly, and criminally negligently; two possible conduct elements—nature of the conduct and result of the conduct; and the effect of the circumstances surrounding the conduct." *Price*, 457 S.W.3d at 441; *see also* TEX. PENAL CODE § 6.03. The gravamen of the offense is utilized to determine which conduct elements should be included in the culpable mental-state language of the jury charge. *Price*, 457 S.W.3d at 441. If the gravamen of the offense is the result of conduct, the jury charge definitions of culpable mental states should be tailored to the result of conduct. *Id.* A trial court errs by failing to limit the definitions of the culpable mental states to the conduct element or elements of the offense to which they apply. *Id.*

–15–

The State concedes it was error to include the "full, unrestricted statutory definition of knowing" without limiting the language of "knowing" to the appropriate conduct element. *See id.* at 441. In considering whether appellant was egregiously harmed by the error, we first consider the entire jury charge. *See Almanza*, 686 S.W.2d at 171. "In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we 'may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge.'" *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995).

The State argues that appellant has not shown he was egregiously harmed, pointing out that the application paragraph for murder "clearly modified the alleged result of appellant's conduct" as follows:

> Now, considering all the law contained in the Court's charge, if you believe from the evidence beyond a reasonable doubt that the Defendant, RONALD ANTHONY ELLIOT, on or about the 1ST day of November, 2020, in the County of Dallas and said State, did unlawfully then and there intentionally or knowingly cause the death of PATRICK RICHARDSON, an individual, hereinafter called deceased, by shooting deceased with a firearm, a deadly weapon, then you will find the defendant guilty of Murder.

> OR

> That on or about the 1st day November, 2020, in Dallas County, Texas, the defendant, RONALD ANTHONY ELLIOT, did then and there intend to cause serious bodily injury to PATRICK RICHARDSON, hereinafter called deceased, and did then and there commit and act clearly dangerous to human life, to-wit: shooting deceased with a firearm, deadly weapon, and did thereby cause the death of PATRICK

–16–

RICHARDSON, an individual, then you will find the defendant guilty of Murder as alleged in the indictment.

If you believe the defendant is not guilty of any offense, or have a reasonable doubt thereof, then you will acquit the defendant and say by your verdict "not guilty."

*See* TEX. PENAL CODE § 19.02(b)(1)–(2). The application portion of the charge instructed the jury that in order to convict appellant of murder, it was required to find beyond a reasonable doubt that appellant intentionally or knowingly caused Richardson's death or intended to cause serious bodily injury to Richardson and committed an act clearly dangerous to human life by shooting Richardson and did thereby cause Richardson's death. *See Patrick*, 906 S.W.2d at 492. The application paragraphs are the "heart and soul" of the jury charge. *See Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012). "It is the application paragraph of the charge, not the abstract portion, that authorizes a conviction." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013) (quoting *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012)). "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see also Crenshaw*, 378 S.W.3d at 466.

In the absence of contrary evidence, we presume the jury followed the trial court's instructions in the application paragraphs of the charge. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) ("[W]e assume that the jury would follow the instruction as given, and we will not reverse in the absence of

–17–

evidence that the jury was actually confused by the charge."). Nothing in the charge in this case emphasized the inapplicable portion of the definition of "knowingly" that appellant complains about, and the application paragraph properly placed the culpable mental states. *See Patrick*, 906 S.W.2d at 492; *Delgado v. State*, 944 S.W.2d 497, 499 (Tex. App.–Houston [14th Dist.] 1997, pet. ref'd) ("Significantly, the 'nature of conduct' language used in the court's definition paragraphs was not repeated in the application paragraphs. We hold that this instruction appropriately limited the overbroad language used in the court's definitions, and pointed the jury to the proper issue to be resolved in a result-oriented offense."). We conclude this factor weighs against a finding of egregious harm.

The next factor is the "state of the evidence." *See Almanza*, 686 S.W.2d at 171. The evidence established, and appellant did not dispute, that appellant shot and killed Richardson and "committed an act clearly dangerous to human life by shooting [Richardson] and murdering him that day." The trial court correctly instructed the jury regarding intentional murder, and there was sufficient evidence to support a conviction under that theory of the offense. Therefore, there was "at least one theory of the offense upon which [appellant's] conviction may stand." *Medina*, 7 S.W.3d at 640. Accordingly, this factor does not weigh in favor of a conclusion appellant suffered some actual, rather than theoretical, harm from the trial court's error in the definition of knowingly in the jury charge.

The third factor requires that we consider the arguments of counsel. *See Almanza*, 686 S.W.2d at 171. The State's closing argument focused on the jury's choice between a decision that appellant acted in self-defense or a decision that Richardson's murder was a "revenge killing." The prosecutor emphasized the elements of appellant's self-defense theory: that appellant's actions were reasonable and immediately necessary. Referring to the video camera recording, the prosecutor maintained the video showed Richardson was "not pulling" a weapon. The prosecutor further contended that, "if anyone has the right to self-defense in this situation, it was [Richardson] because he's being surrounding by five guys who are boxing him in." The prosecutor argued appellant did not act in self-defense and referred to the application paragraph in the charge and the allegations that appellant "knowingly or intentionally caused the death of an individual by shooting an individual, which we've proven, or if he intended to cause serious bodily injury to an individual, and he committed an act clearly dangerous to human life." Defense counsel maintained that appellant was consistent in his belief that he shot Richardson in self-defense. Counsel accused Alberty of tampering with the crime scene and removing Richardson's gun. Counsel described Richardson as "a known drug dealer" with over $6200 in his pocket who was "armed and dangerous." Referring to Richardson's murder of Fisher, counsel argued Fisher did not take Richardson seriously and "lost his life because of that." Counsel argued that, when appellant was "confronted with the same killer," appellant took the threat seriously and shot

–19–

Richardson in self-defense.  The State did not erroneously argue the culpable mental state necessary for the charged offense.  Rather, the closing argument of both parties focused on the issue of self-defense.  We find nothing in the closing arguments to indicate appellant suffered some actual, rather than theoretical, harm from the erroneous definition of knowingly in the jury charge.

We finally must consider any other relevant information revealed by the record as a whole.  *Almanza*, 686 S.W.2d at 171.  We have reviewed the entire record and have found no other relevant information that requires our consideration.

On this record, we conclude the trial court's error in failing to limit the definition of "knowingly" to the applicable conduct element of the offense in the abstract portion of the jury charge caused no actual, as opposed to theoretical, harm to appellant.  *See Campbell*, 664 S.W.3d at 254.

Appellant also argues that the trial court erred by not submitting a jury charge on apparent danger.  It is well-settled that a defendant has the right to defend oneself against apparent danger to the same extent as if the danger was real.  *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996); *Rider v. State*, No. 05-20-00220-CR, 2022 WL 1769116, at *2 (Tex. App.—Dallas June 1, 2022, no pet.) (mem. op., not designated for publication).  Accordingly, the Court of Criminal Appeals has held that if the evidence at trial raises the issue of self-defense—whether against actual or apparent danger—the defendant has the right to a jury instruction on the issue of self-defense.  *Hamel*, 916 S.W.2d at 493.  And in *Jones v. State*, the court held that

when the issue is raised by the evidence, a defendant is entitled to a properly requested instruction on his right to defend himself against an "apparent danger," as viewed from the standpoint of the actor. *Jones v. State*, 544 S.W.2d 139, 142 (Tex. Crim. App. 1976); *Rider*, 2022 WL 1769116, at *2.

The Court of Criminal Appeals subsequently clarified its holding in *Jones*, concluding that it was only error to refuse to give an "apparent danger" instruction in cases in which the jury was not otherwise fully instructed on the law of self-defense.[3] *Valentine v. State*, 587 S.W.2d 399, 400–01 (Tex. Crim. App. 1979). As our sister court later summarized:

> [W]hen a defendant claims self-defense, his rights are preserved (and the concept of "apparent danger" is properly presented) when a jury charge: (1) states that a defendant's conduct is justified if he reasonably believed that the deceased was using or attempting to use unlawful deadly force against the defendant, and (2) correctly defines "reasonable belief."

*Bundy v. State*, 280 S.W.3d 425, 430 (Tex. App.—Fort Worth 2009, pet. ref'd) (citing *Valentine*, 587 S.W.2d at 400–01); *Rider*, 2022 WL 1769116, at *3.

In complaining about the charge's lack of an apparent danger instruction, appellant cites only *Jones* and other authorities that do not reflect the current status of the law on this issue. The jury charge in this case both stated that a person's conduct is justified if he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force and

---

[3] The jury charge contained an instruction on self-defense, and appellant does not challenge that instruction.

correctly defined "reasonable belief." Thus, the charge preserved appellant's rights and properly presented the concept of "apparent danger" without a separate instruction. *See Valentine*, 587 S.W.2d at 400–01; *Bundy*, 280 S.W.3d at 430; *Rider*, 2022 WL 1769116, at *3. Accordingly, on this record, the trial court did not err in failing to include in the charge a separate "apparent danger" instruction.

## C. Fourth Issue: Cumulative Error

Appellant further complains that "the cumulative error doctrine encompassing all of the jury charge errors set forth above when considered as a whole deprived [him] of a fair and impartial trial." "The doctrine of cumulative error provides that the cumulative effect of several errors can, in the aggregate, constitute reversible error, even though no single instance of error would." *Holloway v. State*, No. 05-14-01244-CR, 2016 WL 3098297, at *4 (Tex. App.—Dallas May 25, 2016, no pet.) (mem. op., not designated for publication); *see also Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect."). We have already addressed the single error in the court's jury charge and determined that it did not result in egregious harm to appellant. Thus, there are no errors to cumulate. *See Taylor v. State*, No. 05-14-00821-CR, 2016 WL 7439194, at *9 (Tex. App.—Dallas Dec. 27, 2016) (mem. op., not designated for publication). In other words, a single error is not cumulative error. *See id.* We overrule appellant's second, third, and fourth issues.

**D. Fifth and Sixth Issues**:

In his fifth and sixth issues, argued together, appellant argues the trial court abused its discretion in not allowing appellant to question a detective concerning appellant's cooperation and statement to the police and in not allowing appellant to testify about his cooperation and statement to the police. Appellant asserts the statements in question were admissible pursuant to the rule of optional completeness, citing *Allridge v. State*, 762 S.W.2d 146, 152 (Tex. Crim. App. 1988).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019). A trial court does not abuse its discretion if the decision to admit evidence is within the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). If the trial court's ruling on admissibility is correct under any applicable theory of law, the trial court's decision should not be disturbed, even if the trial court gives the wrong reason for its ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

At a pretrial hearing, the trial court addressed the State's "*Allridge* motion." The prosecutor made the following statement with respect to the motion:

> The State filed a motion called the Allridge motion, which I have presented to the Defense, as well as to the Court, which will say that no one can allude even to the fact that the defendant was interviewed. The law is that any statement made by the defendant outside of court would be hearsay, and as a result, the State is asking not even any mention be made that he was interviewed.

In response, defense counsel said he was "going to tell exactly what happened, that there was a shooting and my client turned himself in and immediately talked to the police." Counsel stated he was also going to tell the jury that "they're going to hear from my client." The prosecutor responded, "That's fine as long as we don't talk about the interview that he did." Defense counsel reiterated his intention to "say that he turned himself in and immediately talked to a detective. I won't go into the technicality of whether he was interviewed, and all that, but I'm saying that he immediately went to law enforcement."

Appellant complains about the exclusion of evidence at both the guilt/innocence and punishment phases of trial. At guilt/innocence, the State called Dallas homicide detective Phillip Wheeler, who testified that, once another detective identified appellant from the surveillance video, police began working on "securing a warrant for murder." Appellant "reach[ed] out and said he did want to come and talk about what – what happened that day, and he did come and talk to me." Meanwhile, a SWAT team responded to the house where appellant was staying and recovered some 9mm bullets and a "Glock magazine."

On cross-examination, Wheeler testified appellant called him, defense counsel asked if he could approach the bench, and the trial court held a discussion outside the presence of the jury. Defense counsel asserted the following:

> Judge, I believe that the door's been opened. They, in their motion in limine, said that we couldn't talk about any -- I guess the fact that the defendant gave a written or oral statement to the police regarding this

–24–

case. And I believe that they opened the door when they say -- have their witness to say before this jury that my client called them and contacted with them and came down and turned himself in. That that opens the door, not necessarily to the -- to me introducing the video, Your Honor; however, under optional completeness, for me to at least refer to -- when he says my client came down -- and I'm trying to make sure I'm specific -- that my client contacted them and -- and -- and turned himself here [sic].

I think that I'm entitled to go into exactly to what extent my client contacted them, especially to the extent that, based on information that my client gave them, they went to his home looking for a firearm and recovered all this -- you know, this ammunition that the State has now paraded in front of the jury.

And I think that I'm entitled to go into, not exactly -- not necessarily -- again, Judge, I'm not trying to offer his interview, but I do want to be able to say that my client immediately went there and told them what happened. And I think I'm entitled to that because they opened the door.

The prosecutor pointed out that there had already been "a hearing on this," and the parties agreed that "all that we would say is that [appellant] was interviewed." The prosecutor noted that the defense "brought up the fact that he had turned himself in," which the parties agreed they were going to do. However, the prosecutor argued "[h]earsay does not allow a defendant to bring up his own statement under any circumstances."

At this point, the trial court asked defense counsel what additional information he was "trying to get into." Counsel replied:

The only thing I'm getting him to [sic] is -- I guess, I believe I'm entitled to because he's had not just this witness, but also another witness, say that my client turned himself in, called her and said, "Well, I'm going to turn myself in."

–25–

So I'm entitled to say, not only did he turn himself in, but, again, he told you what happened. And based on what he told you, you went to the house. And I believe because they – they're talking about him going to the house, trying to recover the weapon, that my client told them would be at the house, I'm entitled to go into it.

Again Judge, I'm not trying to offer his statement, but I do believe that I'm entitled to – that the jury should know that -- that -- that he not only -- he didn't just turn himself in and then they locked him up. That's – that's the image that they've given them right now.

In the discussion that followed, defense counsel acknowledged that appellant was going to testify, so counsel did not need appellant's statement, but he did want the jury "to know that he was fully cooperative." The prosecutor cited *Allridge* for the proposition that self-serving statements of the accused are generally inadmissible at trial on his behalf. The trial court stated, "I am not going to allow you to go into the interview any further than what we discussed at the ruling I had last week."

Thus, defense counsel sought to admit evidence that appellant turned himself in to police and gave a statement. Although appellant did not "need appellant's statement" because appellant intended to testify, counsel sought to develop evidence that the statement led police to "the house" and "trying to recover the weapon" or a "firearm" and recovered "ammunition."

After the discussion outside the presence of the jury, defense counsel continued his cross-examination of Wheeler. After confirming with Wheeler that everything said in the interview with police was recorded, the following exchange occurred:

[DEFENSE COUNSEL]: I don't want to get in to what Mr. Elliott said, but was he cooperative?

[DETECTIVE WHEELER]: He gave a statement.

[PROSECUTOR]: Objection, Your Honor. That's the question. I'm going to object to violating the motion in limine we talked about just now.

[DEFENSE COUNSEL]: Judge – I'll rephrase, Judge.

[DEFENSE COUNSEL]: Him coming to Jack Evans to come and talk to you, do you consider that cooperating? Did that help in your investigation?

[DETECTIVE WHEELER]: Himself turning himself in definitely helps --

[DEFENSE COUNSEL]: Right. Y'all didn't have to go look for him, correct.

[DETECTIVE WHEELER]: Right.

[DEFENSE COUNSEL]: So to that extent, he cooperated, correct.

[DETECTIVE WHEELER]: He -- he did come down and give me a statement.

[DEFENSE COUNSEL]: Okay. Now, as far as -- the gun in the case was never recovered, right?

[DETECTIVE WHEELER]: Right.

[DEFENSE COUNSEL]: But he told you where he thought it was, right? That's why you went to the house, right?

[DETECTIVE WHEELER]: Right.

Appellant characterizes this questioning as an exchange in which appellant "was not allowed to have the detective answer the questions." In support of this characterization, appellant cites the following exchange later during cross-examination:

–27–

[DEFENSE COUNSEL]: All right. And as far as the house, I think you indicated that y'all went out. How did you end up at the house?

[PROSECUTOR]: Objection, Your Honor. That's -- is that violating the motion in limine as well that we just spoke about?

[DEFENSE COUNSEL]: I'll rephrase.

[DEFENSE COUNSEL]: You testified earlier about this house were y'all found these cartridges and all that?

[DETECTIVE WHEELER]: Right.

[DEFENSE COUNSEL]: Where did you get the information...

THE COURT: I want all counsel to remember the ruling that I just gave.

Appellant follows this quoted exchange with the assertion that his "counsel was prevented from letting the jury know that [appellant] cooperated and gave the detective information about where he left the gun at his house and that [appellant's] information helped the police to locate ammunition, a magazine to a Glock as well as other evidence based upon [appellant's] cooperation and statement." Consequently, appellant argues, "the trial court abused its discretion by preventing the admission of this line of questioning and same affected [appellant's] substantial rights thereby harming him by depriving him of a fair and impartial trial."

Appellant asserts the same argument with respect to the punishment stage where, he argued, he was entitled to present a complete version of the facts that included appellant making a statement to police and providing information to police that led to police "going to get all this ammunition and stuff." Appellant specifically complained that, without this information, the evidence was only that "all he did was

–28–

go down there and turn himself in." Appellant requested that, "under optional completeness and under this Allridge," he "would like to have presented to the jury the complete facts regarding what took place" when appellant met with Wheeler. As counsel asserted previously, he did not seek to have his statement to police entered into evidence.

We agree with the State that the evidence appellant sought to introduce was before the jury. Wheeler testified appellant gave a "statement," and the trial court did not rule on the prosecutor's objection to this testimony. As defense counsel continued the cross-examination, Wheeler testified that appellant "turning himself in definitely helps," appellant "did come down and give [Wheeler] a statement," police never recovered "the gun in the case," but appellant "told [Wheeler] where he thought it was," and "[t]hat's why [police] went to the house." Although the trial court did not permit appellant to testify to this same evidence at punishment, the jury at the punishment phase could consider the evidence admitted at the guilt-innocence phase as well. *Christopher v. State*, 851 S.W.2d 318, 322 (Tex. App.—Dallas 1993, pet. ref'd). Because the evidence appellant sought to develop was already before the jury, we conclude the trial court did not abuse its discretion. *See Colone*, 573 S.W.3d at 264–65. We overrule appellant's fifth and sixth issues.

We affirm the trial court's judgment.

/Bonnie Lee Goldstein/

BONNIE LEE GOLDSTEIN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
220790F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RONALD ANTHONY ELLIOTT, Appellant

No. 05-22-00790-CR   V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas Trial Court Cause No. F20-76874-T. Opinion delivered by Justice Goldstein. Justices Molberg and Pedersen, III participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 21st day of August 2024.